TULLOH, Appellee and Cross–Appellant,

v.

GOODYEAR ATOMIC CORPORATION et al., Appellants and Cross–Appellees.

[Cite as *Tulloh v. Goodyear Atomic Corp.* (1994), 93 Ohio App.3d 740.]

Court of Appeals of Ohio,
Pike County.

No. 504.

Decided March 23, 1994.

742

*Connerton, Ray & Simon* and *Ronald Simon; Waite, Schneider, Bayless & Chesley, Allen P. Grunes* and *Louise M. Roselle,* for appellee and cross-appellant.

*Vorys, Sater, Seymour & Pease, Robert E. Tait* and *Steven M. Loewengart,* for appellants and cross-appellees.

HARSHA, Presiding Judge.

Goodyear Atomic Corporation, Martin Marietta Energy Systems, Inc., and Divested Atomic Corporation, defendants below and appellants and cross-appellees here (collectively referred to as "Goodyear" or "appellants"), and Michael Tulloh, plaintiff below and appellee and cross-appellant here ("appellee"), appeal from a judgment entered by the Pike County Court of Common Pleas. Appellants assign five errors and in his cross-appeal, appellee assigns three errors.

The record contains the following relevant facts. From June 24, 1975 to November 26, 1986, appellants employed appellee at the Portsmouth Gaseous Diffusion Plant in Piketon, Ohio. Appellee worked as a uranium materials handler, dealing primarily with liquid and crystalline uranium hexafluoride ("$UF_6$"). On March 13, 1985, appellee was injured when he was exposed to a release of $UF_6$. Appellee filed for and received workers' compensation. In

August 1985, Dr. Kelly, one of appellee's treating physicians, released appellee for work without restrictions. Doctors' records indicate that appellee's only lingering problem was irritable bowel syndrome. However, appellee did not work from August 1985 to March 1986, because of a layoff and disciplinary suspension.

Appellee returned to work on March 3, 1986. After that date, appellee only worked during the following periods:

March 3—May 30, 1986

July 7—Sept. 5, 1986

Nov. 4-20, 1986.

At trial, appellee presented a letter from Dr. Kelly dated June 2, 1986, which indicated that appellee should not work in areas with potential exposure to $UF_6$. Appellants contend that this letter is not in any of Tulloh's medical or personnel files and Dr. Jones, the plant physician, testified he never saw this letter. Although appellee could not recall how or to whom this letter was delivered, he insisted he gave the letter to some representative of appellants.

From September 5, 1986 through November 4, 1986, appellee did not work because he was hospitalized for sinus surgery and to treat bacterial infections discovered in his throat. On October 15, 1986, appellee attempted to return to work with letters of restriction from Drs. White and Kelly. Drs. White and Kelly allowed appellee to return to work with the restriction that he not work in any area of potential exposure. Appellee was sent home because no work was available to him with restrictions.

On November 4, 1986, appellee returned to work. Plant records indicated that appellee talked to a plant nurse at about 8:00 a.m. These records also indicate that appellee was still restricted from working in areas with potential $UF_6$ exposure. At about 10:00 a.m. the same morning, appellee was instructed to return to the plant physician, Dr. Jones, who examined him. Dr. Jones told appellee to return to work "without restrictions." At trial, Kenneth Lauderback testified that on the morning of November 4, 1986, Cleveland Jones, the plant human resources director, stated that he was upset with appellee and the medical restrictions and would terminate appellee the first chance he got. On November 19 and November 20, 1986, appellee worked double shifts, then went to the hospital for independent urinalyses. Apparently, appellee was terminated as of that date.

Appellee filed a complaint in federal district court on December 31, 1986, alleging intentional tort. The federal court subsequently dismissed appellee's case for lack of subject matter jurisdiction. On February 19, 1988, appellee filed a complaint in the Pike County Court of Common Pleas alleging intentional tort and wrongful discharge. The trial court granted appellants' Civ.R. 12(B)(6)

motion to dismiss for failure to state a claim upon which relief could be granted. This court affirmed the dismissal of the intentional tort claim and reversed the dismissal of the wrongful discharge claim. *Tulloh v. Goodyear Atomic Corp.* (Sept. 4, 1990), Pike App. No. 449, unreported, 1990 WL 138483. The Ohio Supreme Court reversed our judgment regarding the intentional tort claim and affirmed our reversal on the wrongful discharge claim. *Tulloh v. Goodyear Atomic Corp.* (1992), 62 Ohio St.3d 541, 584 N.E.2d 729.

Appellee then filed an amended complaint. On May 11, 1992, the trial court granted appellants' motion to dismiss the wrongful discharge claim and on October 13, 1992, the trial court filed a judgment entry granting, in part, appellants' motion for summary judgment. The entry allowed appellee to present evidence to establish intentional tort subject to the following limitations:

(1) injury which occurred on or after February 19, 1986 (because of statute of limitations).

(2) injury resulting from exposure to *chemically* toxic substances (not radiation), specifically $UF_6$, $HF$, $UO_2F_2$, and fluorine.

(3) emotional pain and suffering *resulting from injury* (not from fear of developing cancer).

The parties conducted a jury trial from October 19 to October 23, 1992. Before the case was submitted to the jury, the trial court overruled appellants' motion for a directed verdict. The jury returned a verdict for appellee, awarding him $100,000 in compensatory damages. The jury did not award punitive damages, but did find that appellee was entitled to attorney fees. Appellants filed motions for judgment notwithstanding the verdict and for a new trial, both of which the trial court overruled. The trial court did, however, vacate the attorney fees award because of the lack of an award of punitive damages. This appeal and cross-appeal followed.

## GOODYEAR'S APPEAL

"I. The trial court erred in denying defendants' motions for directed verdict, judgment, and judgment notwithstanding the verdict."

In their first assignment of error, appellants argue that the evidence presented at trial was insufficient as a matter of law to support the verdict. Therefore, they contend, the trial court erred in overruling their motions for directed verdict and judgment notwithstanding the verdict.

A motion for a directed verdict presents a question of law, not a question of fact, even though in deciding such a motion it is necessary to review and consider the evidence. *Grau v. Kleinschmidt* (1987), 31 Ohio St.3d 84, 90, 31

OBR 250, 255, 509 N.E.2d 399, 404. A motion for directed verdict tests the legal sufficiency of the evidence. *Eldridge v. Firestone Tire & Rubber Co.* (1985), 24 Ohio App.3d 94, 24 OBR 164, 493 N.E.2d 293. Accordingly, we make an independent review. When considering a motion for a directed verdict, a court must construe the evidence most strongly in favor of the party against whom the motion is directed. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284, 21 O.O.3d 177, 178–179, 423 N.E.2d 467, 469–470. A court considering a motion for directed verdict must determine not whether one version of the facts presented is more persuasive than another; rather, the court must determine whether the trier of fact could reach only one result under the theories of law presented in the complaint. *Id.* Where there is substantial competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, the motion must be denied. *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 109, 592 N.E.2d 828, 837.

■ Similarly, when reviewing a denial of a motion for judgment notwithstanding the verdict, we apply the same test as that applied in reviewing a motion for directed verdict. *Pariseau v. Wedge Products, Inc.* (1988), 36 Ohio St.3d 124, 127, 522 N.E.2d 511, 514–515, citing *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 429–430, 344 N.E.2d 334, 338.

The Ohio Supreme Court has set out the test used in an employee's action alleging an intentional tort by his or her employer. The court held in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, at paragraphs one and two of the syllabus:

"[I]n order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.

"To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent."

The employee has the burden of proving by a preponderance of the evidence that the employer had actual knowledge of the *exact dangers* which ultimately caused the injury. *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 172, 539 N.E.2d 1114, 1116–1117; *Fuchsman v. Dallas & Mavis Forwarding Co., Inc.* (Feb. 6, 1990), Ross App. No. 1562, unreported, at 17, 1990 WL 9959. The employee need not prove either actual subjective intent upon the part of the employer to produce the resultant harm, or that the employer had knowledge of the *specific harm* that might be suffered by the injured employee. *Fyffe, supra,* 59 Ohio St.3d at 117, 570 N.E.2d at 1111–1112; *McDonald v. Contrs. & Indus. Builders* (Aug. 27, 1992), Scioto App. No. 91 CA 2005, unreported, 1992 WL 209499.

Appellants contend that the evidence presented at trial was insufficient as a matter of law to establish the elements of knowledge or injury.

We first address the question of whether appellee presented sufficient evidence of the requisite knowledge of appellants. Because appellee's sole claim of injury is that exposures in 1986 aggravated his prior injuries or preexisting conditions, appellee must show that the company knew of the condition and that subsequent exposures to $UF_6$ and other compounds would aggravate appellee's condition or cause new injuries.

Appellants initially argue that even if appellee did give to appellants the June 2, 1986 letter from Dr. Kelly containing the restriction that appellee could not work in an area where there was potential for exposure, when appellee returned to work in early July, he brought a letter containing no restrictions. Therefore, appellants argue they could not have knowledge of a substantial certainty of injury.

Appellants further contend that the only possible basis upon which the jury could have found knowledge was when appellee returned to work in November. Dr. Jones, knowing that there was *no job available* to appellee with restrictions, sent appellee back to work with *no* restrictions, even though Drs. White and Kelly had placed restrictions on appellee's return to work. Appellants argue that while this may present a jury the question of whether such action was negligent or reckless, "reasonable minds simply could not conclude that the plant Medical Director, a Board certified specialist with twenty plus years experience, would have returned Tulloh to work with the knowledge that additional injury was either certain or substantially certain to occur."

Appellants introduced a report written by Dr. Vilter, who examined appellee in January 1986, following appellee's March 1985 exposure and before appellee returned to work in March 1986. Appellants also read Dr. Vilter's trial deposition to the jurors, although the transcript is not included in the record. Dr.

Vilter concluded in this report that the only remaining physical problem appellee was suffering from was irritable bowel syndrome.

Appellee counters that appellants did not need letters from doctors restricting appellee's work to show the necessary knowledge. Appellee argues: (1) appellants' own testimony was that they knew in 1970 that they needed a local exhaust ("gulper") system to prevent harmful exposures; (2) appellants knew exposures to harmful substances were going on all the time; (3) appellants sent employees for "special" (*i.e.*, in addition to the scheduled) urinalyses when they were in the vicinity of a known release and, therefore, appellants knew of continuing exposures; further, (4) appellants knew of appellee's 1985 exposure and injury and should have known that continuing exposures would be very hazardous to appellee.

Construing the evidence most strongly in favor of appellee as we must, we conclude that appellee presented sufficient evidence to support the jury's conclusion that appellants knew in 1986 that sending appellee back to work in Building X–344 as a uranium materials handler was substantially certain to cause injury. Appellee presented the testimony of James Albers, an industrial hygienist. Following a review of numerous documents including incident reports, Department of Energy and plant documents available to appellants before and during 1986, Albers testified that in his opinion, in 1986, it was very likely that putting appellee to work in Building 344 would expose him to hydrogen fluoride ("HF") or uranylfluoride and that such exposure would aggravate appellee's preexisting injuries and conditions. Further, appellee's physician, Dr. Kelly, testified that exposure to $UF_6$ and its resulting compounds was known, before 1986, to cause upper respiratory problems as well as gastrointestinal system problems. Albers, Kelly, and White all testified that it was well known that exposure to $UF_6$ and fluoride compounds aggravated upper respiratory conditions such as those suffered by appellee.

The record clearly contains evidence which, if the jury believed it, would establish that appellants knew or should have known of both appellee's ongoing problems and the recommendation of Kelly that appellee not be required to work in an area where he might be exposed to $UF_6$, HF or fluorine. Appellee and Kelly testified that Kelly wrote a "to whom it may concern" letter dated June 2, 1986, a copy of which was admitted into evidence, indicating that appellee is able to work in an uncontaminated and fluoride-free area. Appellee testified that he is sure he gave this letter to appellants, either through the plant hospital or human resources department. Dr. Jones testified that none of appellants' files regarding appellee contained this letter. Appellants make much of the fact that Dr. Kelly wrote another letter dated June 25, 1986, which was in Dr. Jones's file, stating that appellee "will be fit to work July 2, 2986 [*sic* ]." This letter did not

mention any work restrictions. Kelly explained that he did not believe he needed to repeat his earlier instruction that appellee needed to work only in an area free of $UF_6$, HF, and fluorine. Thus, construing this evidence most strongly in favor of appellee, the jury could have believed that appellants knew as early as June 2, 1986, that appellee was still having upper respiratory and gastrointestinal problems due at least in part to $UF_6$ exposure and that further exposures would be substantially certain to cause him more injury.

Appellants also contend in this first assignment of error that the evidence is not sufficient to establish that appellee suffered any injury related to his exposures in X–344. Appellants argue that appellee did not identify any specific dates or incidents which allegedly caused him injury. Appellants cite Exhibit 73, apparently the conclusion of the Department of Energy in September 1986, that none of Tulloh's complaints violated any federal or state regulation. Appellants also argue that any continuing sinus and gastrointestinal problems resulted from the 1985 exposure which, because of the statute of limitations, was not an issue in this case.

Appellee presented evidence showing that at least five releases of $UF_6$ occurred in the X–344 building between July 7, 1986 and September 2, 1986, several of which involved appellee. Appellee also testified that smaller releases occurred on a regular basis, not all of which were recorded in appellants' records.

Kelly, White, and appellee testified about appellee's health problems in 1986 and to the present. Appellee had to have polyps removed from his colon, sinuses and throat, and he was hospitalized for sinus surgery and then again to fight the infections Dr. White found in appellee's throat. Although Dr. White would not say that 1986 exposures caused all of appellee's injuries, he testified that 1986 chemical exposures aggravated appellee's medical problems. Further, Dr. White said that although he could not say for sure that 1986 chemical exposures caused the infections for which appellee was hospitalized, he did testify that the chemical exposures would certainly make appellee more susceptible to the infections and that they indicated an acute illness related to post-July 1986 exposures. Dr. Kelly testified that chemical exposures in 1986 aggravated and exacerbated appellee's gastrointestinal and upper respiratory injuries.

Appellee also introduced evidence establishing that his urinalysis showed fluoride in his urine on May 30, August 15, August 28, September 2 and November 20, 1986. One of appellants' witnesses testified that none of the fluoride levels shown in appellee's urinalyses rose above levels which can be found in people not exposed to chemicals and caused by ordinary influences such as diet and the amount of fluoride in the drinking water. However, as we are required to construe the evidence most strongly in appellee's favor, the jury could reasonably have concluded that appellee's injuries and illnesses, including the

polyp development in 1986 through 1992, were caused at least in part by 1986 exposures. Accordingly, we overrule appellants' first assignment of error.

"II. The jury's verdict was against the manifest weight of the evidence presented."

In their second assignment of error, appellants contend that the jury's verdict was against the manifest weight of the evidence. Where the burden of proof is preponderance of the evidence, an appellate court will not reverse a judgment claimed to be against the weight of the evidence if the record contains some competent credible evidence going to every element. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79, 10 OBR 408, 409–410, 461 N.E.2d 1273, 1275–1276.

Appellants argue first that judgment in favor of appellee is against the weight of the evidence because (1) appellee attempted to equate releases with injury and confused the jury, despite the fact that no one but appellee was injured; (2) even appellee acknowledged that having the local exhaust system and leak rating system in place would not have prevented either the August 26, 1986 incident or the September 2, 1986 release from the cold-trap area in which appellee was involved.

Appellee emphasized both at trial and in his brief to this court, that appellants knew as early as 1970 that a local exhaust ("gulper") system would help to avoid worker exposure during a release and that appellee suggested appellants install a leak-rating system which would help to detect chemical leaks. However, the fact that the releases still would have occurred even if these devices were in place has no relevance to this case. The issue is whether appellee was injured because of working in an area where appellants knew there was a substantial certainty of harm to him.

We believe the record contains some competent credible evidence of every necessary element such that the judgment in favor of appellee is not against the weight of the evidence. The record is replete with evidence that releases and exposures to chemicals occurred on a regular basis. Both appellee and appellants presented evidence that appellants had in place a urinalysis program in which employees, like appellee, were tested weekly for chemicals in their systems. In addition, employees were sent for "special" urinalyses when they were known to be involved in a release. Appellee presented evidence that several of his urinalyses between July and September were "special," indicating that appellants knew that appellee had been exposed. Evidence supports appellee's contention that appellants knew of his 1985 injury and that appellants knew that continued exposure to $UF_6$ would cause further harm to appellee.

Appellants also contend that the verdict of $100,000 was against the weight of the evidence. When reviewing a damage award, an appellate court must not reweigh the evidence. An appellate court may not disturb a damage award unless it lacks support from any competent credible evidence. *Baum v. Augenstein* (1983), 10 Ohio App.3d 106, 10 OBR 129, 460 N.E.2d 701; *Day v. Clifford* (Aug. 24, 1993), Pike App. No. 499, unreported, 1993 WL 326389. Appellee argues that the $100,000 verdict is supported by the evidence because there was evidence of almost $10,000 in medical expenses to date and the probable cost of future colonoscopies which appellee is required to undergo on regular basis will be over $50,000. Further, the jury was instructed it could consider pain and suffering, the extent of the injury, appellee's inability to perform usual activities, anxiety over recovery and the cost of hospital and medical expenses. Appellee testified at trial about the things he could no longer do. He further testified about his pain and anxiety caused by worrying about his working conditions and his health.

Appellee cites the $50,000 future costs for colonoscopies as a major factor supporting the $100,000 damage verdict. Our reading of the evidence suggests that the necessity for future colonoscopies resulted in large part from the original 1985 exposure. However, the jury could have found that $100,000 adequately compensated appellee for his physical injuries as well as his emotional problems resulting from his employment with appellants. Accordingly, appellants' second assignment of error is overruled.

"III. The trial court erred in permitting the jury to consider medical treatment which both Tulloh's treating physicians related to his March 1985 workers' compensation claim."

In their third assignment of error, appellants argue that counsel stipulated that all bills for medical treatment from June 1986 to January 1988 were subsequently determined by the Industrial Commission to be related to the 1985 injury. Thus, appellants argue that the decision of the Industrial Commission is binding on the parties in this case, citing *Smith v. LTV Steel* (Oct. 29, 1992), Cuyahoga App. No. 63313, unreported, 1992 WL 316324. Appellants apparently contend that the court erred in admitting evidence relating to those medical bills or records which appellee's physicians related to the 1985 injury. The admission or exclusion of relevant evidence is a matter within the sound discretion of the trial court. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary. *Rock v. Cabral* (1993), 67 Ohio St.3d 108, 112, 616 N.E.2d 218, 222; *Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd.* (1992), 63 Ohio St.3d 498, 506, 589 N.E.2d 24, 30–31. When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its

judgment for that of the trial court. *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 138, 566 N.E.2d 1181, 1184–1185, citing *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301, 1308–1309.

The record does not include any ruling by the Industrial Commission or any statement by counsel explaining the Industrial Commission's determination. Regarding the stipulation, the record reveals that the following exchange took place before appellants rested:

"[Appellants' counsel]: Okay, pursuant to the discussion that we had earlier in your chambers this morning, Your Honor, it is my understanding that the plaintiffs [*sic*] are willing to stipulate that all medical treatments from 1986 until ... what's the last one ... all medical treatments starting with June the 2nd, 1986 and concluding with January 21st, 1988, as reflected on Plaintiff's Exhibit # 1, which we also have agreed to admit into evidence, were medical treatments which, at the time, the plaintiff and the treating physician indicated to the Bureau of Workers Compensation, were related to his March 13th 1985 industrial injury.

"[Appellee's counsel]: No, it's not (inaudible) said they were, so I'm not saying the plaintiff did. Some of the (inaudible, objecting to Mr. Tait's statement)

"[Appellants' counsel]: Okay, this ... let me ... the plaintiff wouldn't have to do it. Okay, that the physicians involved represented to the Bureau of Workers Compensation that they were related to Mr. Tulloh's March 13th, 1985 industrial injury.

"COURT: Is that a fair statement?

"[Appellee's counsel]: Yes.

"COURT: Okay, so that's a stipulation.

"[Appellants' counsel]: That's a stipulation."

Thus, it appears that the parties only stipulated that appellee's *physicians* represented to the Bureau of Workers' Compensation that appellee's 1986 treatment expenses related to the 1985 injury. Appellants' attorney, during the trial, cross-examined the doctors about their use of the 1985 injury date on workers' compensation forms and various reports. We are unclear as to what appellants contend the trial court should have excluded because they agreed to admit Plaintiff's Exhibit 1, the summary of medical bills. Even if the court did improperly admit the medical bills, appellants have not indicated how, if at all, they were prejudiced by this admission. For reversal, appellants must establish not only error, but that they were prejudiced by this error. *Gries Sports Enterprises, Inc. v. Cleveland Browns Football Co.* (1986), 26 Ohio St.3d 15, 28, 26 OBR 12, 23–24, 496 N.E.2d 959, 969–970. The court allowed appellants to argue to the jury that the bills which referenced 1985 related only to the 1985

injury. Accordingly, the trial court did not err in allowing the physicians to testify or in failing to treat as binding a determination of the Industrial Commission. Appellants' third assignment of error is overruled.

"IV. The trial court erred in allowing testimony by plaintiff's industrial hygienist, Mr. Albers."

In the fourth assignment of error, appellants contend that the court erroneously allowed Albers, an industrial hygienist, to testify as an expert for appellee. Evid.R. 702 provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." The decision to qualify a witness as an expert is within the sound discretion of the trial court and will not be reversed unless the court abused that discretion. As noted above, an abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary. *Rock, supra.*

Albers testified that allowing appellee to work in the 344 building was "likely to lead to" or "had a high probability of leading to" an injury to appellee. He relied upon information he had gleaned from government documents relating to appellants' monitoring of chemical releases. He also testified, in response to a hypothetical question, that a person who had previously been injured by an exposure to $UF_6$ would have a high likelihood of being reinjured by additional exposures. Further, he stated that this information was known as of 1986, although the court would not allow him to testify that appellants knew or should have known the risk of injury.

Appellants contend that Albers did not have sufficient expertise to testify on the subject matter of this case because he had no medical training and had no knowledge of the particular plant involved. Further, Albers acknowledged that he was not "up to speed" on the health effects of $UF_6$. Albers testified that he is a certified industrial hygienist and has substantial experience in occupational safety and health. He has evaluated hazards in the workplace, including exposure to fluorides and has extensive training and significant experience in worker health and health protection. Although he did not visit the Piketon plant, Albers reviewed plant records and government documents containing much information about the plant.

Because Albers testified about matters within his range of expertise, we cannot say that the trial court abused its discretion in allowing his testimony as an expert in the field of industrial hygiene. Appellants' concerns regarding Albers's qualifications to give an opinion on the Piketon plant and to testify about medical

matters go only to the weight and credibility of Albers's testimony, and were subjects of cross-examination. Accordingly, we overrule appellants' fourth assignment of error.

"V. The trial court erred in excluding the testimony of Mr. Lauderbach concerning the history of workers' compensation claims at the plant."

■ Tulloh's witness, Mr. Lauderbach, served as the union Workers' Compensation representative from 1982 to 1989. On cross-examination, appellants' attorney attempted to elicit testimony regarding workers' compensation claims due to exposure injury:

"Q. * * * I believe at the time that Mr. Loewengart took your deposition earlier in this case, one of the things that you indicated was in the time that you were the Workers' Compensation Benefit Rep you only recall 10 or 15 claims in the entire history that anybody had for any type illness or exposure."

The trial court did not indicate its reasons for sustaining Tulloh's objection to this line of cross-examination. Appellants argue in their brief only that excluding this testimony was prejudicial error without stating why such testimony should have been admitted. The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. *State v. Combs* (1991), 62 Ohio St.3d 278, 284, 581 N.E.2d 1071, 1077–1078; *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Assuming that Goodyear's attempt to impeach Lauderbach and/or to get him to state that few claims had been made was improperly excluded, we do not believe the defendants' case rose or fell upon this testimony. In other words, the error, if any existed, was harmless. See Civ.R. 61. Furthermore, Goodyear had access to plant records and could have produced this evidence by other means. We overrule appellants' fifth assignment of error.

### TULLOH'S CROSS–APPEAL

"I. The trial court erred in entering judgment that did not reflect the jury's verdict that the plaintiff is entitled to an award of attorneys' fees."

■ In his cross-appeal, Tulloh argues in his first assignment of error that the trial court erred by entering a judgment that did not include an attorney fees award.

The court instructed the jury:

"Punitive damages are damages which a jury may, but is not required to award as punishment and to discourage others. Punitive damages are an exception to the general rule of compensation for injury, and are allowable against a Defendant upon clear or convincing proof that the acts or omissions of a Defendant

demonstrated actual malice toward the Plaintiff. 'Actual malice' means (1) conduct characterized by hatred, ill will or a spirit of revenge or (2) a conscious disregard for the rights and safety of others that has a great probability of causing substantial harm. This behavior may be inferred from all the surrounding circumstances.

"You as the trier of fact then must determine whether the Defendants are liable for punitive damages, and if you decide that the conduct of the Defendants justifies an award of punitive damages, the attorneys' fees of the lawyers employed by the Plaintiff of this case."

The jury then awarded $100,000 compensatory damages to Tulloh. The jury's verdict form stated: "The plaintiff is not entitled to punitive damages. The plaintiff is entitled to attorneys' fees." The court immediately pointed out to counsel that there may be a problem with an inconsistent verdict because of the award of attorneys' fees without a punitive damage award. Counsel and the court agreed to discharge the jury and deal with the problem later.

Tulloh argues that the jury is presumed to follow the court's instructions and, therefore, the jury must have found that Goodyear's conduct *justified* punitive damages, but they just set the value at zero. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313. The finding of an intentional tort does not necessarily mean that the standard for punitive damages has been met. In the former, the intent standard is "substantial certainty of injury," while the standard for punitive damages is "conscious disregard that has a great probability of causing substantial harm." Further, to establish an intentional tort by an employer, the employee need not show subjective intent. *McDonald, supra.*

Most courts hold that the jury must *actually award* punitive damages before an award of attorney fees is proper. In *Digital & Analog Design Corp. v. N. Supply Co.* (1992), 63 Ohio St.3d 657, 662, 590 N.E.2d 737, 742, the court stated:

"[T]he requirement that a party pay attorney fees * * * is a punitive (and thus equitable) remedy that flows from a jury finding of malice and the award of punitive damages. * * * Without a finding of malice and the award of punitive damages, plaintiff cannot justify the award of attorney fees, unless there is a basis for sanctions under Civ.R. 11." See, also, *Davis v. Tunison* (1959), 168 Ohio St. 471, 477, 7 O.O.2d 296, 299, 155 N.E.2d 904, 908; *Henry v. Akron* (1985), 27 Ohio App.3d 369, 371, 27 OBR 465, 466–467, 501 N.E.2d 659, 662–663; *Howard v. Urey* (Sept. 9, 1988), Trumbull App. No. 3889, unreported, 1988 WL 94379. But, see, *Atram v. Star Tool & Die Corp.* (1989), 64 Ohio App.3d 388, 392, 581 N.E.2d 1110, 1112–1113, holding that punitive damages need not be actually awarded, *i.e.,* a finding that punitive damages could properly have been awarded is sufficient to support an attorney fees award.

Under the facts of this case where the jury was discharged without any attempt to reconcile its somewhat inconsistent determinations, we agree that an award of punitive damages was a prerequisite to an award of attorney fees. See *Montgomery v. Anderson* (Mar. 2, 1993), Washington App. No. 92CA12, unreported, 1993 WL 63440. Therefore, the trial court properly vacated the attorney fees award.

"II. The trial court erred in granting defendants' motion to dismiss plaintiff's wrongful discharge claim."

In Tulloh's second assignment of error, he contends that the trial court erroneously granted Goodyear's motion to dismiss his wrongful discharge claim. Prior to trial, the trial court granted the motion to dismiss count two of Tulloh's amended complaint, which alleged in part:

"22. Pursuant to Article II, Section 34 of the Ohio Constitution, and R.C. 4101.12, Defendants had an obligation to provide a safe place of employment. Defendants violated R.C. 4101.12 in failing to provide a safe place of employment.

"23. Pursuant to Article I, Section[s] 1 and 11 of the Ohio Constitution, the First Amendment to the United States Constitution and R.C. 4101.13, Plaintiff had a right and a duty to report unsafe working conditions. Plaintiff believes and therefore avers that Martin Marietta's purpose in wrongfully terminating Plaintiff was in retaliation for Plaintiff's exercise of his rights and duties under law.

" * * *

"25. Plaintiff believes and therefore avers that defendant Martin Marietta's purpose in wrongfully terminating Plaintiff was to eliminate from its workforce an employee known to voice his concerns about an unsafe and improper work environment and thereby perpetuate its violation of the laws."

In *Tulloh v. Goodyear Atomic Corp.* (1992), 62 Ohio St.3d 541, 584 N.E.2d 729, the Supreme Court held in the syllabus: "Absent statutory authority, there is no common-law basis in tort for a wrongful discharge claim." The court stated that *Greeley v. Miami Valley Maintenance Contrs., Inc.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, allowed an exception to the employment-at-will doctrine only when the employer terminates the employee in direct violation of a statute. The court then held that because Tulloh had not alleged a statutory violation, there was no basis in tort for a wrongful discharge claim. Three justices joined in a strong dissent from the syllabus, stating that they would hold that Tulloh stated a viable claim for the tort of wrongful discharge based upon a violation of public policy. They cited *Greeley:*

"Today we only decide the question of a public policy exception to the employment-at-will doctrine based upon a violation of a specific statute. This is not to say that there may not be other public policy exceptions to the doctrine

but, of course, such exceptions would be required to be of equally serious import as the violation of a statute." *Greeley*, 49 Ohio St.3d at 234–235, 551 N.E.2d at 987, cited in *Tulloh*, 62 Ohio St.3d at 547, 584 N.E.2d at 734.

The *Tulloh* dissenters cited R.C. 4113.52 [1] as evidence that public policy demands that employees who voice concerns aimed at correcting unsafe working conditions be protected against retaliation.

The *Tulloh* dissenters would not require a statutory violation and believed that Tulloh stated a claim based upon the strong public policy of providing a safe working environment and encouraging employees to try to remedy perceived unsafe working environments. However, we are bound by the *Tulloh* syllabus and therefore overrule this assignment of error.

"III. The trial court erred in granting partial summary judgment barring plaintiff's emotional distress claim."

In his third assignment of error, Tulloh argues that the trial court erred in granting partial summary judgment barring his emotional distress claim. At the final pretrial on September 30, 1992, Tulloh indicated for the first time that he intended to present evidence of emotional distress based upon his fear of developing cancer or other adverse health effects. The trial court on October 13, 1992, held that Tulloh could only present evidence of emotional pain and suffering resulting from injury. In his amended complaint, Tulloh did not allege a separate cause of action for intentional or negligent infliction of emotional distress. He only raised "emotional pain and suffering" as part of his intentional tort injury claim. Tulloh argues that instead of prohibiting him from presenting evidence regarding emotional distress because of the complaint, the court should have allowed him to amend his complaint pursuant to Civ.R. 15(A). Tulloh contends that Goodyear would not have been prejudiced by such an amendment. We agree with Goodyear that the trial court properly denied Tulloh the opportunity to present an emotional distress claim for two reasons.

First, the Civil Rules require Tulloh to seek leave to amend the complaint by written motion or orally at a hearing. Civ.R. 7(B); Civ.R. 15(A); *Studier v. Taliak* (1991), 74 Ohio App.3d 512, 515–516, 599 N.E.2d 718, 720–721. Because he never sought leave to amend, he waived argument that the court should have allowed him to amend. *Coulter Pontiac v. Pontiac Motor Div.* (1981), 4 Ohio App.3d 169, 172, 4 OBR 269, 273, 446 N.E.2d 1128, 1131–1132.

---

1. Note: R.C. 4113.52 prohibits retaliation by an employer against an employee who reports suspected violation of state or federal statute or regulation and provides a civil remedy when the employer retaliates. However, R.C. 4113.52 has prospective application only, *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, and was enacted after appellee was terminated.

Second, even if Tulloh had made the motion, it could have been properly denied. Under Civ.R. 15(A), the trial court may consider whether the motion for leave to amend is timely, whether there is any explanation for the failure to allege the claim earlier, and whether an amendment would cause prejudice. *Wilmington Steel Products, Inc. v. Cleveland Elec. Illum. Co.* (1991), 60 Ohio St.3d 120, 122–123, 573 N.E.2d 622, 624–625; *Taliak, supra; Meadors v. Zaring Co.* (1987), 38 Ohio App.3d 97, 99, 526 N.E.2d 107, 109–110. The decision to grant or deny a motion to amend the complaint is within the sound discretion of the trial court. Here, there is no abuse of discretion because Tulloh did not raise the issue until three weeks before the trial date. Therefore, Tulloh's third cross-assignment of error is overruled.

*Judgment affirmed.*

PETER B. ABELE and GREY, JJ., concur.