DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from a judgment of the Lucas County Court of Common Pleas. After a jury trial, the common pleas court entered a judgment in favor of appellees, Consolidated Systems, Inc. ("Consolidated") and Assemblers, Inc. ("Assemblers").
 {¶ 2} Appellant, Art Iron, Inc. ("Art Iron"), asserts the following assignments of error:
 {¶ 3} "1. The jury erred in returning a verdict in favor of appellee, Consolidated Systems, Inc. ("CSI") on its complaint against Art Iron and against Art Iron on its counterclaim against CSI."
 {¶ 4} "2. The jury erred in returning a verdict in favor of appellee, Assemblers, Inc. ("Assemblers") on its counterclaim against Art Iron and against Art Iron on its third party complaint against Assemblers."
 {¶ 5} "3. The trial court erred in denying Art Iron's motion for judgment notwithstanding the verdict and upholding the jury's verdict against CSI and against Art Iron."
 {¶ 6} The facts material to a disposition of Art Iron's assignments of error are as follows.
 {¶ 7} Art Iron, whose fabrication division is located in Toledo, Lucas County, Ohio, contracted with the Pinckney Community Schools and its general contractor, George A. Auch, to provide and install, among other things, steel deck for the roof of a new high school in Pinckney, Michigan.
 {¶ 8} Art Iron subsequently entered into a subcontract with Consolidated for the purchase and delivery of the steel roof deck at a cost of $163,265. This contract contained an indemnity clause under which Consolidated agreed to hold Art Iron "harmless from every claim, demand, loss, expense, damage or injury, including attorney fees, which may arise or which claim to have been caused by, attributable to, or results from material and/or work supplied/performed under this purchase order."
 {¶ 9} Art Iron entered into a "subcontract agreement" with Assemblers for the installation of the steel roof deck. This unsigned subcontract had an indemnity clause comparable to the agreement between Art Iron and Consolidated in that Assemblers agreed to indemnify Art Iron for all damages, claims, losses or expenses, including attorney's fees, "caused in whole or in part by any act or omission" of Assemblers, its agents, its employees or its subcontractors.
 {¶ 10} In the case under consideration, only certain sections of the deck, which were installed in areas denominated as Zone D and part of Zone E, are the subject of the dispute between Art Iron, Consolidated, and Assemblers. Therefore, unless otherwise specified, any further reference to the steel roof deck provided by Consolidated and installed by Assemblers alludes only to those portions of the deck in Zone D and Zone E.
 {¶ 11} Consolidated does not fabricate or apply chemicals to the steel that it cuts and shapes for a particular project. Instead, it purchases coils of steel, made to specifications, from major manufacturers, e.g., U.S. Steel. In this case, U.S. Steel immersed the steel in hot, liquid zinc in order to protect the steel from the elements; this process is called galvanization. The steel was also treated with a chromium based material that reacts with the zinc to provide extra protection from corrosion.
 {¶ 12} After receiving the galvanized steel from U.S. Steel, Consolidated's plant, which is located in South Carolina, milled the deck. The deck was temporarily stored on a covered loading dock. The deck, which is deeply ridged and approximately 30 feet long, was bundled in stacks of several sheets. These bundles were later placed on flatbed truck trailers, and transported uncovered, to the construction site, arriving there on January 22, 1998. It is undisputed that Consolidated never covers steel deck during transportation and that the deck in this case was wet when it arrived at the site.
 {¶ 13} The bundles were then stored on the site on a graveled "lay down" area that was slightly sloped so that any moisture could drain from between the sheets of deck. It, as well as all of the roof deck used in the project, was stored uncovered. However, the deck was not laid on the ground. Rather, it lay on top of wood "four-by-fours or six-by-sixes." Assemblers does not cover stored steel deck and did not do so in the instant case.
 {¶ 14} The weather during the early months of the year 1998 was not conducive to the erection of a new building. It snowed or rained, and there were frequent freezes and thaws. The work site was in such a poor condition that Assemblers shut down the project for 10 to 14 days in January. It remained wet and muddy through at least the month of March. Thus, the project was behind schedule at the time that the steel roof deck arrived and it was stored in bundles for a longer period of time than the usual three to four days that it is normally stored.
 {¶ 15} Furthermore, it is undisputed that the roofers usually follow immediately behind the "deckers" as they spread out and tack down a steel roof deck. This is done in order to protect the deck from corrosion. Nonetheless, in the case before us, the bids for the roof for the Pinckney High School project were not made until April 1998 and the roof was not in place until June 1998.
 {¶ 16} During the first week in February, the roof deck was unbundled, hoisted to the roof, spread out, and tacked down. Patrick Thompson, the detail foreman for Assemblers stated that all of the deck, not only those sections for Zone D and Zone E, was wet when it was unbundled. Thompson stated that the deck was wet because "It rained every day, just about everything was wet. * * * Or snow. * * * [E]verything you touched was wet and icy and slippery and snowy * * *." Moreover, all of the roof deck was stored in the same manner and subjected to similar weather conditions as the deck in Zone D and part of Zone E.
 {¶ 17} According to Terry Handricks, Assemblers' general foreman, and Patrick Thompson, some of the deck for Zone D and part of Zone E had a "white powder" on it or a "chalky look." Handricks noted that by the beginning of March, Zone D started to "freckle" with spots of rust. By April 8, 1998, virtually all of Zone D had some rust. At that time, Handricks took some photographs of the corrosion and gave them to Darla Hornyak, Art Iron's project manager.
 {¶ 18} In April 1998, Ron Clore, the construction manager for George Auch Co., also noticed spots of rust on the deck. He had those areas treated with Galvaprep, a spray used to galvanize steel, but it was ineffective. By the end of April, the rust was prevalent in Zone D and part of Zone E.
 {¶ 19} At the beginning of May, Clore contacted Darla Hornyak, who, in turn, sent a letter to Ray Molinaroli, the project manager for Consolidated. The letter, and accompanying photographs, informed Molinaroli of the corrosion and requested a method of curing the problem. Consolidated never offered a means to remedy the situation.
 {¶ 20} On May 6, 1998, John R. Burhenn, the architect for the Pinckney high school project, issued a report recommending that the rusted portions of the roof deck be removed and replaced. He also stated that Art Iron should contact Consolidated in order to determine the extent of the problem and its effect on all other decking. Hornyak faxed a copy of the architect's report to Molinaroli. She then sent a fax to Frank Sample, President of Assemblers, asking him to begin removal of the roof deck in the affected zones. The work was to be done "on a time and material basis."
 {¶ 21} On May 19, 1998, Molinaroli and Barry Heine, a representative of U.S. Steel, inspected the construction site. They obtained samples of the roof deck in Zone D for testing. Molinaroli agreed to provide the replacement deck. Nevertheless, he also expected Art Iron to pay for it. He testified that because he believed that Art Iron had already decided "to go to court" over the replacement of the roof deck, he asked Hornyak "to keep track of the hours and time" Assemblers expended in removing the corroded roof deck and replacing it with new deck. From Molinaroli's statement, Hornyak inferred that Consolidated, not Art Iron, was going to pay Assemblers for that time. Therefore, Hornyak signed Assemblers' time sheets as "Darla Hornyak for CSI [Consolidated]."
 {¶ 22} Molinaroli mailed two invoices, totaling $19,549.62, for the cost of the replacement steel roof deck, but Art Iron refused to pay any amount on this account. On October 27, 1998, Molinaroli sent a letter to Hornyak and a "bulletin" from U.S. Steel setting forth the results of the tests performed on the sample taken from the site in May. The bulletin indicated that the steel decking sheets met "the customer's specifications and exhibited no deficiencies in quality or workmanship." It concluded that the heavy corrosion on the galvanized decking was caused by improper storage and the presence of accelerating compounds, specifically, nitrate and sulfate.
 {¶ 23} In his letter, Molinaroli denied any liability for the rusted roof deck and demanded payment for the replacement deck. Art Iron again refused to accede to that demand Art Iron also declined to render full payment to Assemblers for the labor it provided on the high school project.
 {¶ 24} On February 7, 2001, Consolidated filed a complaint against Art Iron seeking payment, plus interest, for the cost of the replacement steel roof deck. Art Iron answered and asserted counterclaims against Consolidated that included: (1) breach of an express warranty; (2) breach of implied warranty; (3) breach of implied warranty of fitness for a particular purpose; (4) breach of an express duty to indemnify; (5) breach of an implied duty to indemnify; and (6) a request for a declaratory judgment stating that Art Iron was not liable to Consolidated for any additional costs incurred by Consolidated to replace the corroded steel roof deck. Under the indemnity claims, Art Iron contended that any losses sustained by Assemblers was caused by the action or inaction of Consolidated. Thus, Art Iron asserted that if it was found responsible to Assemblers for the faulty steel roof deck, Consolidated was required to indemnify Art Iron for the amount of the judgment and any and all costs of its defense.
 {¶ 25} Art Iron also filed a third-party complaint against Assemblers alleging that the corrosion of the steel roof deck was caused by "the actions or inactions of either" Consolidated or Assemblers. It therefore alleged, in the alternative to its counterclaims against Consolidated, that if Art Iron was found liable to Consolidated, Assemblers had, pursuant to its purchase order, an express duty to indemnify Art Iron for such liability and any expenses and costs of its defense. Art Iron also requested a declaratory judgment pronouncing that Art Iron was not responsible for any additional costs incurred by Assemblers in removing and replacing the corroded deck.
 {¶ 26} Assemblers filed an answer and a counterclaim against Art Iron praying for an award of $123,437.78, plus interest, costs and attorney's fees. The claim was based upon two theories of recovery, namely, breach of contract and unjust enrichment.
 {¶ 27} After a three day trial, the jury returned a verdict in favor of Consolidated on its complaint and verdict against Art Iron on its counterclaim. The jury further rendered a verdict in favor of Assemblers on its third-party counterclaim and a verdict against Art Iron on its third-party complaint.
 {¶ 28} On September 19, 2002, the trial court entered a judgment ordering Art Iron to pay Consolidated $19,549.62 plus interest at ten percent per annum until the date (August 30, 2002) of the jury verdict and post-judgment interest until the date the entire award is paid. The court also ordered Art Iron to pay Assemblers $123,437.78 62 plus interest at ten percent per annum until the date of the jury verdict as well as post-judgment interest until the award is paid in full. Finally, the trial court entered judgments in favor of Consolidated and Assemblers on Art Iron's counterclaim and third-party claim, respectively.
 {¶ 29} According to Art Iron, it filed, pursuant to Civ.R. 50(B), a motion for a judgment notwithstanding the verdict. However, this motion is not contained in the record of this case. Nevertheless, the trial court denied the motion on December 12, 2002, and this appeal followed.
 {¶ 30} We shall consider Art Iron's first and second assignments of error together. In these assignments, Art Iron contends that the jury's verdicts finding in favor of Consolidated and in favor of Assemblers are against the manifest weight of the evidence because both of these subcontractors had an express and/or implied duty to indemnify Art Iron for losses caused by their acts or omissions. Art Iron maintains, in essence, that the indemnity clauses apply because the evidence offered at trial demonstrated that the replacement costs of the steel roof deck stemmed from (1) Consolidated's breach of contract for its failure to cover the steel deck during transportation; and (2) Assembler's breach of express and/or implied contract to store the steel deck properly. In other words, Art Iron is actually arguing that the jury's verdict on its counterclaim against Consolidated and third party claim against Assemblers is against the manifest weight of the evidence.
 {¶ 31} In a civil case, we will not reverse a judgment that is supported by some competent, credible evidence going to the essential elements of the case. C.E. Morris Co. v. Foley Constr.Co. (1978), 54 Ohio St.2d 279, syllabus. "The concept of indemnity embraces aspects of primary and secondary liability. "Indemnification occurs when one who is primarily liable is required to reimburse another who has discharged a liability for which that other is only secondarily liable." Krasny-KaplanCorp. v. Flo-Tork, Inc. (1993), 66 Ohio St.3d 75, 78, citing Prosser Keeton on Torts (5 Ed. 1984) 341, Section 51. Therefore, and assuming, arguendo, that both subcontracts are valid agreements between the parties, to prevail on its indemnity claims, Art Iron was required to demonstrate, by a preponderance of the evidence, that either Consolidated or Assemblers was primarily liable for the corrosion of the steel roof deck. SeeHecklinger v. Doehler-Jarvis Farley Industries, Inc. (May 15, 1987), 6th Dist. No. L-86-276.
 {¶ 32} Here, the jury was confronted with conflicting expert evidence, as well as conflicting lay witness evidence, on the cause of the corrosion of the steel roof deck. For example, Michael Simko, a research engineer employed by U.S. Steel and one of Art Iron's experts, testified that the roof deck developed "wet storage stain." He described wet storage stain as: "a condition on zinc-coated products that occurs when the material is in an environment that allows it to begin to corrode. The natural corrosion product of zinc is white; with steel or iron, it's red. Wet storage stain occurs * * * when the product is wet and allowed to be wet for a period of time."
 {¶ 33} Simko indicated, however, that bundled galvanized steel could be exposed to moisture for short periods of time without developing wet storage stain. It was his opinion, within a reasonable degree of scientific certainty, that the corrosion of steel roof deck for the new high school was not due to transportation. Instead, Simko opined that
 {¶ 34} the deck corroded because it was stored in a wet condition for a prolonged period of time.
 {¶ 35} Contrary to Simko's opinion, Darla Hornyak, who had 22 years of experience as a project manager for Art Iron, testified that Assemblers stored the roof deck in accordance with the custom and standards required by Art Iron. She also was of the opinion that Assemblers did nothing wrong in the way that it stored the deck.
 {¶ 36} Art Iron's second expert, David Moore, who has degrees in metallurgical engineering and materials engineering, testified that, to a reasonable degree of scientific certainty, the wet storage stain occurred because the tightly bundled steel was allowed to get wet (by Consolidated) and stayed in a wet condition (due to Assemblers' method of storage) for a prolonged period of time. If the steel arrived at the construction site in a wet condition, Moore agreed that a prolonged period of time would be more than three or four days. He also testified that covering the deck with a tarp during transportation would have kept the deck dry, and that if the deck was wet when it arrived, the problem could have been avoided by spreading the steel out to dry or putting in spacers between the sheets of steel.
 {¶ 37} Terry Handricks disagreed with Moore's statement concerning the means by which the deck could have been dried. He said that laying the deck out to dry would be physically impossible due to a lack of space and would be a safety concern because the wind could blow the deck around the site. As for placing spacers between the sheets, Handricks again worried about the wind blowing the large sheets of deck all over the site. He also stated that covering the wet deck after it arrived would not have alleviated the corrosion problem. According to Handricks, placing the deck on blocks on a stoned and sloped area is normally employed during the course of erecting a building to prevent excess corrosion of the deck and that this was done in this instance. He further testified that the deck is always shipped uncovered and has previously arrived at a construction site wet.
 {¶ 38} John Malone, Assemblers' expert witness, an engineer who has extensive knowledge of the process of galvanizing steel, expressed an opinion that failing to cover the deck during transportation was the origin of the wet storage stain. He claimed that the instructions for storage on the reverse side of Consolidated's bill of lading would be inappropriate in this case or would exacerbate the condition or were unheard of in a situation like this.
 {¶ 39} The foregoing testimony is only a portion of the conflicting evidence offered in the three day trial. The determination of the weight to be afforded this evidence and the credibility to be given to the testimony of the witnesses are issues to be determined by the jury as trier of fact. See Statev. Dye (1998), 82 Ohio St.3d 323, 329. "`The jury is not required to give any additional weight to the opinion of an expert, if any weight at all'". Erie Ins. Co. v. Cortright,
11th Dist. No, 2002-A-0101, 2003-Ohio-6690 at ¶ 14 (Citation omitted.). Consequently, the jury was free to believe all, part or none of the testimony of each witness who appeared before them. Rogers v. Hill (1998), 124 Ohio App.3d 468, 470. Finally, we must keep in mind that the evidence adduced in this case is susceptible to more than one construction; thus, we are required to give it the interpretation consistent with the verdict rendered. Bush v. Cardinal Co., 7th Dist. Nos. 02 539 CA, 02 HA 546, 2003-Ohio-5443 at ¶ 15 (Citation omitted.). For this reason, we must find that the jury's verdicts in favor of Consolidated and Assemblers and the verdicts against Art iron are not against the manifest weight of the evidence. Art Iron's first and second assignments of error are found not well-taken.
 {¶ 40} In its third assignment of error, Art Iron maintains that the trial court erred in failing to grant its Civ.R. 50(B) motion for a judgment notwithstanding the verdict and upholding the verdict in favor of Consolidated. As stated previously, Art Iron's motion is not contained in the record of this case. Nonetheless, the trial court's judgment makes clear the fact that Consolidated was the only party that was the subject of Civ.R. 50(B) motion.
 {¶ 41} "The standard for granting a motion for judgment notwithstanding the verdict * * * pursuant to Civ.R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ.R. 50(A)." Texler v. D.O. Summers Cleaners Shirt Laundry Co. (1998), 81 Ohio St.3d 677, 679. When considering a motion for a directed verdict, a court must construe the evidence most strongly in favor of the party against whom the motion is directed. Osler v. Lorain (1986),28 Ohio St.3d 345, 347. "A court considering a motion for directed verdict must determine not whether one version of the facts presented is more persuasive than another; rather, the court must determine whether the trier of fact could reach only one result under the theories of the law presented in the complaint. * * * Where there is substantial competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, the motion must be denied." Tulloh v. GoodyearAtomic Corp. (1994), 93 Ohio App.3d 740, 747 (Citation omitted.)
 {¶ 42} Based upon the evidence as set forth above, and viewing this evidence in a light most favorable to Consolidated, there was substantial competent evidence offered favoring Consolidated so that reasonable minds might reach differing conclusions as to whether Consolidated's acts or omissions caused the corrosion of the roof deck. Therefore, the trial court did not err in denying Art Iron's motion for a judgment notwithstanding the verdict, and Art Iron's third assignment of error is found not well-taken.
 {¶ 43} On consideration whereof, this court finds that substantial justice was done the party complaining, and the judgment of the Lucas County of Common Pleas is affirmed. Art Iron is ordered to pay the costs of this appeal.
Judgment Affirmed.
Handwork, Knepper, and Lanzinger, J.J, concur.