SINEA et al., Appellees and Cross–Appellants,

v.

DENMAN TIRE CORPORATION, Appellant and Cross–Appellee.

[Cite as *Sinea v. Denman Tire Corp.* (1999), 135 Ohio App.3d 44.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 98–T–0036.

Decided Oct. 1, 1999.

48

50

*Raymond J. Tisone,* for appellees and cross–appellants.

*Frank G. Mazgaj* and *Robert L. Tucker,* for appellant and cross–appellee.

CHRISTLEY, Judge.

Appellant and cross-appellee, Denman Tire Corporation ("Denman"), appeals the judgment of the Trumbull County Court of Common Pleas, which entered a favorable verdict on the intentional tort claim of appellees and cross-appellants David J. Sinea and Susan E. Sinea ("the Sineas") in the amount of $125,000 following a jury trial. The Sineas filed a cross-appeal challenging various portions of the trial court's judgment. For the reasons that follow, we affirm the judgment of the trial court regarding the appeal itself and reverse the judgment in part and remand the matter for further proceedings regarding the cross-appeal.

David Sinea ("Sinea") began working at Denman in 1978. He was a member of a union recognized by Denman. His employment relationship with Denman was governed by a collective bargaining agreement. During his employment, Sinea performed various manual labor jobs involving the manufacturing of tires. Many of the jobs required heavy lifting.

Over the years, Sinea sustained a variety of workplace injuries, including injuries to his back in 1979, 1988, and 1990. Beginning in 1990, Sinea was placed on medical restrictions that limited the type of activities he could perform. His own personal doctor and a corporate doctor working for Denman concurred in the restrictions. These restrictions indicated that he was not to lift any object weighing more than twenty-five pounds and that he was not to engage in any activity that required repetitive twisting, bending, climbing, or overhead lifting.

These restrictions were placed in Sinea's employment file at Denman as well as documentation indicating that his injuries were permanent. As a result of the restrictions, Sinea was granted a "medical bump" in 1990 pursuant to the collective bargaining agreement. This meant that he could transfer to another job at the tire plant that would be more suitable for his medical restrictions and that he was entitled to displace or "bump" an employee at the desired job with less seniority in the union.

Nevertheless, from 1990 to May 4, 1995, the date of the injury at issue in this case, Sinea continued to work in various jobs that required him to perform activities that violated his medical restrictions in one form or another. However, Sinea testified that he did not have a terrible problem with the situation when Scott Tackett ran the day-to-day operations of personnel at Denman up until the middle of 1992. Although Sinea continued to work on jobs during Tackett's reign that, by their very description, violated his medical restrictions, he did so with the general understanding from Tackett that he was to seek assistance from other employees or from mechanical devices such as cranes in order to avoid reinjury to his back.[1]

According to Sinea's testimony, the situation changed drastically once Patricia Durkin took over the daily management of personnel from Tackett in 1992. Sinea testified that Durkin "had it out for him" and was unwilling to recognize the 1990 medical restrictions. According to Sinea, Durkin continually insisted that he "update" the restrictions to indicate what improvements had occurred in his back condition since 1990. However, Sinea believed that Durkin did not really want an update on the restrictions; rather, she refused to accept them at face value.

He also testified that she appeared to get "kind of mad" at him when he expressed concerns over job assignments that would cause him to violate his work restrictions. Sinea also testified that Durkin questioned his doctor's treatment of

---

1. However, on cross-examination, Sinea indicated that he believed that even Tackett evidenced an intent to harm him because Tackett was reluctant to grant him the medical bump in 1990.

his back condition through the use of pain medication and therapy, suggesting that his doctor was "hurting him" and that he needed surgery.

Sinea further testified that in April 1993, Durkin began to inform his supervisors and foremen that he had no valid medical restrictions that Denman was required to honor. Sinea was aware of this because the foreman told him, "Pat Durkin says you don't have restrictions, and that you have to do what you're told or you will be fired." According to Sinea, some of his supervisors acted in accordance with Durkin's instructions and insisted that he do whatever job he was told to do, regardless of the medical restrictions. Sinea thereafter feared that he would be fired if he refused to perform any task assigned to him.

Moreover, according to both Sinea's and his wife's trial testimony, Durkin expressly threatened Sinea at a wage loss hearing on March 7, 1995. According to the Sineas, Durkin stated, "We don't recognize that you have restrictions, and if you don't do what you're told, you are going to be fired for insubordination."

Subsequently, on March 9 and March 23, 1995, Sinea presented two forms from his personal doctor, indicating that the medical restrictions imposed in 1990 should continue permanently.[2] On the second form, Sinea's doctor strongly recommended that he not operate a particular machine at the plant called the spiral lathe and that he not perform any other task that would aggravate his prior back injury.

During the first week of April 1995, Sinea was assigned to work as a laboratory assistant. Sinea testified that he was extremely happy during this time because the job suited his medical conditions perfectly. However, he was thereafter assigned to other allegedly unsuitable tasks, culminating in his assignment to yard maintenance during the first week of May 1995.

During this week, Sinea was ordered to sweep, shovel soot from a driveway, pick up trash from the ground, and empty trash. Sinea contends that he complained to his supervisors that these assignments would cause him to violate his medical restrictions because they involved repetitive bending and twisting. According to Sinea, his supervisors laughed at him and ordered him to do the assigned tasks anyway. In addition, one of the supervisors referred to him as "fucking handicapped."[3] On the fourth day of being assigned to maintenance/yard work, Sinea experienced terrible back pain while sweeping. Sinea left

---

2. Between the imposition of the original medical restrictions in 1990 and the March 1995 restrictions, Sinea's doctor also provided similar restrictions in December 1993.

3. Only one of the two supervisors testified at trial, essentially denying that Sinea complained about the job violating his medical restrictions, that Durkin ever told them to ignore Sinea's medical restrictions, and that he laughed at Sinea when Sinea complained to him.

the plant with the permission of his supervisor, but without filling out an accident report form.

Sinea sought medical attention and was later diagnosed with an aggravation of his prior back injury of 1988. Although he had unsuccessfully attempted to file a grievance through the union about Durkin's behavior prior to the May 1995 injury, he did not attempt to pursue relief for the May 1995 injury through the procedures set forth in the collective bargaining agreement.

In addition, Sinea testified that he had also asked his shop steward to inform Tackett about Durkin's failure to honor the medical restrictions prior to the May 1995 injury. Tackett informed the shop steward that he, Tackett, was no longer responsible for those types of complaints, despite the fact that he remained the head of personnel. At trial, Tackett disputed this testimony, indicating that he expressly told Sinea and his foreman in 1994 that the restrictions were valid and that he did not want Sinea to undertake any activity that would cause him to reinjure his back.

Two weeks after the date of the injury, Sinea went back to Denman to fill out an accident report. While doing so, one of his supervisors asked him, "What is it with you and Durkin?" Sinea asked the supervisor what he meant, and Sinea was informed that Durkin was trying to get him fired for leaving work without the supervisor's permission. The supervisor denied that this conversation ever took place.

Sinea testified that following the May 4, 1995 reinjury to his back, he became completely incapacitated and was no longer able to perform the simplest of everyday activities such as walking, carrying groceries, etc. He also testified to various psychological problems such as anxiety and depression that allegedly stemmed at least in part from his problems at Denman and the chronic pain he suffered. His wife also testified about the various problems the couple was experiencing as a result of Sinea's back injury and mental state.

On July 3, 1995, the Sineas filed suit against Denman, alleging the commission of an intentional tort in the workplace and loss of consortium. Denman answered, denying the claims.

At trial, Durkin testified that she was simply trying to find out more information about the extent of Sinea's injuries and his medical condition because one of the initial medical reports indicated that there was a chance of improvement in his condition. She testified that she attempted to find out more information about the extent of Sinea's condition in April 1993 after Sinea submitted a form for excused medical leave. At the time, she telephoned Sinea's doctor and his attorney, but was unable to obtain any information.

She also testified that Sinea presented her with one medical leave form in late February 1995 on which Sinea's doctor failed to indicate that the medical restrictions were continuing. Nevertheless, she conceded that Sinea presented additional medical restriction forms from his doctor in March 1995 and that she was aware of the contents of the forms.

Durkin also expressly denied threatening to have Sinea fired if he failed to perform jobs that violated his medical restrictions, indicating that only Tackett had the authority to fire the employees. In this regard, she expressly denied the statements attributed to her at the March 7, 1995 wage loss hearing. She also denied ever telling Sinea or anyone else that Denman refused to recognize his medical restrictions, except for conceding that she did ask for updates.

Yet, inexplicably, she conceded on cross-examination that she authorized a document as late as May 10, 1995 that indicated that Denman was appealing a workers' compensation claim from Sinea on the grounds that "Employer does not have medical stating current conditions." Durkin also conceded that she informed Sinea's foreman that Sinea had no medical restrictions sometime in 1993. According to Durkin, she made this statement at a time when she had not read Sinea's file. After reading his file, she indicated that she made efforts to comply with his restrictions and informed the foremen of them. Nevertheless, she continued to seek updates on the status of his permanent condition.

She further explained that she did not intentionally assign jobs to Sinea that would cause him to violate his work restrictions and that she was not responsible for assigning jobs each week. Nevertheless, she conceded that she "assisted" the supervisors, superintendents, and manufacturing manager in assigning employees to positions each week. Her testimony also established, as did Sinea's, that she approached Sinea on several occasions to discuss whether certain jobs would be acceptable to him given his restrictions.

Regarding Sinea's final assignment to the yard maintenance position, Durkin's testimony indicates that she did not discuss the assignment with Sinea in advance as she had done with the other assignments. She also testified that Sinea never came to her to complain about the position or to indicate that it would require him to violate his medical restrictions. She also testified that she knew of his medical restrictions when Sinea was assigned to the yard maintenance position, yet she did not have reason to believe that the superintendent would actually assign tasks that violated his medical restrictions. In this regard, Sinea testified that the vast majority of the duties of a yard maintenance person clearly required activities that would cause him to violate his restrictions.

Tackett also supplied some testimony to explain Denman's actions. According to Tackett, Durkin was hired to go through employee files and do evaluations of excessive medical costs and the like. He also indicated that the position of lab

assistant was not available to Sinea during the first week of May because another employee with more seniority in the union was entitled to it. Nevertheless, Tackett conceded that the lab position would have been available to Sinea at the time of trial as the employees working in the lab at that time had less seniority than Sinea.

Tackett also supplied personnel records that indicated that one of the supervisors Sinea claimed to have a conversation with about the yard maintenance position on May 2, 1995 was actually in Cincinnati on that day. On cross-examination, Tackett denied ever asking an employee to violate his medical restrictions or that Durkin ever caused Sinea or any other employee to violate his medical restrictions. He also indicated that neither he nor Durkin actually assigned jobs to the employees each week, and that the two acted more as "consultants" to the other supervisors and managers at the plant.

Denman moved for a directed verdict at the close of the Sineas' case and at the close of all the evidence, both of which were denied. The jury returned a verdict in favor of the Sineas with a finding of $125,000 in damages. Denman thereafter moved for judgment notwithstanding the verdict and a new trial based on opposing counsel's alleged misconduct during closing arguments and other alleged errors at trial. Both motions were denied. Denman perfected a timely appeal and asserts three assignments of error for our consideration:

"[1.] The trial court erred to the prejudice of defendant–appellant in overruling its motion for directed verdict made at the close of plaintiffs–appellees' case.

"[2.] The trial court erred to the prejudice of defendant–appellant in overruling its motion for judgment notwithstanding the verdict.

"[3.] The trial court erred to the prejudice of defendant–appellant in overruling its motion for a new trial."

The Sineas assert three assignments of error in the cross-appeal as follows:

"[1.] The trial court erred in denying [the] Sineas' motion for prejudgment interest and in denying [the] Sineas their right to present evidence at the prejudgment interest hearing.

"[2.] The trial court committed reversible error by removing the issue of punitive damages and consequently attorney fees, from the consideration of the jury.

"[3.] The trial court erred in denying appellees' motion for attorney fees and expenses for failure to admit."

In the first and second assignments of error, Denman complains that the trial court erred when it denied its motion for a directed verdict, which it renewed at the close of all the evidence, and its motion for judgment notwithstanding the

verdict. Since the standards of review are the same, we will address these assignments in a consolidated fashion. *Tulloh v. Goodyear Atomic Corp.* (1994), 93 Ohio App.3d 740, 639 N.E.2d 1203. The trial court was required to deny the instant motions if reasonable minds could reach different conclusions based on the evidence presented at trial, after construing that evidence most strongly in favor of the party against whom the motion is made. *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 74 O.O.2d 427, 344 N.E.2d 334.

In these assignments, Denman argues that there was no evidence upon which the jury could base a finding of intentional conduct under the standard set forth by the Supreme Court of Ohio in *Fyffe v. Jeno's, Inc.* (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108. Denman further contends that there was no evidence that any act of any person other than Sinea was the proximate cause of his May 1995 back injury.

Paragraphs one and two of the syllabus of *Fyffe* read:

"1. Within the purview of Section 8(A) of the Restatement of the Law 2d, Torts, and Section 8 of Prosser & Keaton on Torts (5 Ed.1984), in order to establish 'intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task. (*Van Fossen v. Babcock & Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph five of the syllabus, modified as set forth above and explained.)

"2. To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of risk—something short of substantial certainty—is not intent. (*Van Fossen v. Babcock & Wilcox Co.* [1988], 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph six of the syllabus, modified as set forth above and explained.)"

In the case at bar, the jury received special interrogatories at Denman's request, which asked it to indicate whether each of the three prongs of the *Fyffe* tests had been established and whether the preponderance of the evidence established that Denman's intentional act was the proximate cause of Sinea's injuries.[4] All of these interrogatories were answered in the affirmative.

When we construe the evidence before the jury most strongly in favor of the Sineas, we believe there was sufficient competent, credible evidence upon which the jury could find that Denman committed an intentional tort against Sinea. As a result, the trial court did not err by denying both Denman's motion for a directed verdict and motion for judgment notwithstanding the verdict.

■ First, we note that the *Fyffe* test is directed primarily towards situations where the employer is deemed to have intentionally exposed an employee to environmental dangers in the workplace such as toxic chemicals or dangerous machinery. Nevertheless, the test can also be logically applied to dangerous practices or procedures such as requiring employees to work in positions that violate the employee's valid medical restrictions. See *Tulloh, supra,* 93 Ohio App.3d 740, 639 N.E.2d 1203,

■ In this respect, we disagree with Denman that the Sineas had to prove that it knew that sweeping was an inherently dangerous activity. Instead, the Sineas had to prove that Denman knew that its policy was to require an employee to work in positions that violated an employee's specific medical restrictions.

■ In this regard, Tackett testified that the company participated in a system where an employee's seniority status in the union dictated whether that employee would be transferred to a job that accommodated the employee's medical restrictions. In other words, if a more senior employee was occupying a position that would suit an employee with a medical restriction, the more senior employee

---

4. "Interrogatory A: 'Do you find by a preponderance of the evidence that Defendant, Denman Tire Corporation, knew of the existence of a dangerous process, procedure, instrumentality or condition within its business operation?' The answer is yes. That is signed by all eight members of the Jury.

"Interrogatory B: 'Do you find by a preponderance of evidence that Defendant, Denman Tire Corporation, knew that if an employee were subjected to this dangerous process, procedure, instrumentality or condition, harm to the employee was substantially certain to occur?' That is answered yes, signed by all eight members of the Jury.

"Interrogatory C: 'Do you find by a preponderance of the evidence that Denman Tire Corporation under such circumstances, and with such knowledge, required Plaintiff to continue to perform the dangerous task?' That is answered yes, signed by six members of the Jury.

"Interrogatory D: 'Do you find by a preponderance of the evidence that Denman Tire Corporation's intentional act was the proximate cause of an injury to Plaintiff, David Sinea, and that the Plaintiff suffered damage from the injury?' That is answered yes, signed by six members of the Jury."

could not be displaced. Instead, the employee with the medical restriction would need to search for another position, or work in a position that violated his medical restrictions.[5]

There was no question that Denman's agents were aware of this general procedure or process at the plant. Moreover, Denman's agents did not dispute that it would be inherently dangerous and unsafe to require employees to perform tasks that caused them to violate valid medical restrictions. Consequently, sufficient competent credible evidence supported the jury's finding that the first prong of the *Fyffe* test was met.

█ Under the second prong, the Sineas needed to prove that Denman's agents knew that there was a substantial certainty that harm would come to Sinea if he were assigned to jobs that caused him to violate his medical restrictions. In this regard, Denman's management did not dispute that harm was substantially certain to befall Sinea or any other employee required to do jobs that violated a medical restriction. Nor did Denman's evidence dispute the fact that at least two doctors warned management on multiple occasions that Sinea would reinjure his back if he were assigned to tasks that caused him to violate his medical restrictions. This was sufficient evidence to establish that the second prong of the test was met.

█ Under the third and final prong of the *Fyffe* test, the Sineas had to prove that Denman nevertheless required Sinea to perform tasks that caused him to violate his medical restrictions, despite knowledge by Denman that there was a substantial certainty that Sinea would reinjure his back as a result. On this point, Denman's evidence contested several factors. Denman's representatives maintained that it never assigned jobs to Sinea, that any job that was assigned to him did not violate his restrictions, and that he was free to ask for assistance if he could not perform a particular task due to his medical restrictions. They further maintained that Sinea's individual supervisors were made aware of his restrictions so they would not require him to perform specific tasks in the job description that would cause him to violate his medical restrictions.

Viewing the evidence in a light most favorable to the Sineas, however, an entirely different picture emerges. First, while both Tackett and Durkin denied being the person or authority responsible for assigning jobs to the employees each week, the testimony overwhelmingly established that they were very involved in employee job assignments. Reasonable inferences could be drawn that both were downplaying their authority and power in the job assignment process and that they both possessed the authority to assign jobs on behalf of

---

5. We are not aware of any claim by the Sineas against the union in the case at bar.

Denman. Indeed, the fact that Durkin admittedly discussed other job placements with Sinea prior to the yard maintenance position indicates that she had significant control over the job placement process.

Furthermore, Sinea's testimony contradicted Tackett's and Durkin's claims that they never assigned any jobs to him that required the performance of tasks in violation of his medical restrictions, as well as their claim that his supervisors were instructed to honor his medical restrictions. According to Sinea, his supervisors, during the week of the injury, laughed and insulted him when he protested his assignment on the grounds that it violated his medical restrictions.

In this regard, there was a serious issue as to the general credibility of Denman's representative, Durkin. Apparently, the jury resolved it in the Sineas' favor. Although Durkin denied any suggestion that she refused to honor Sinea's valid work restrictions, she admitted that she continually required that he provide updates for a permanent medical condition. Moreover, she continued to indicate that there were no updated medical restrictions in Sinea's file as late as May 10, 1995, *after* Sinea had provided her with at least two updates in March 1995. She also flatly denied threatening Sinea that he would be fired if he continued to insist that he had valid medical restrictions at the March 7, 1995 wage loss hearing. The Sineas expressly contradicted this testimony.

Moreover, Durkin maintained that she had no reason to believe that the yard maintenance superintendent would assign Sinea specific tasks that would cause him to violate his medical restrictions. However, the evidence, when viewed in a light most favorable to the Sineas, did not support her assertions. In this regard, the jury received a copy of the job description for the position of "Yard Man." The duties of the position included, among others, sweeping, emptying trash barrels, repairing skids, cleaning walkways, shoveling snow, filling holes in and leveling the parking areas, and assisting the parts man in receiving and storing *heavy supplies and equipment.* The vast majority of the tasks in the job description violated Sinea's restrictions; thus, it belied Durkin's testimony at trial.

Thus, viewing this evidence in a light most favorable to the Sineas, the jury could reasonably infer that Durkin knowingly assigned Sinea to a position that would require him to perform tasks in violation of his restrictions and that would create a substantial certainty of harm to Sinea. Again, the element of substantial certainty of the harm was supported by the instructions from Sinea's doctor and the corporate doctor that he could not perform the restricted acts or he would reinjure his back.

■ As to the issue of proximate cause, Sinea's doctor testified that the pain and symptoms Sinea was experiencing were caused by the reinjury to his back on

May 4, 1995. The doctor also opined that Sinea would not be able to perform any manual jobs at Denman in the future due to the injury of May 4, 1995. The Sineas testified as well to his limited physical capacity following the May 4, 1995 injury. This was competent, credible evidence going to the issue of proximate cause.

 Denman also argues that its motions for directed verdict and judgment notwithstanding the verdict should have been granted on the grounds that Sinea failed to exhaust the grievance and arbitration procedures set forth in the collective bargaining agreement between Sinea's union and Denman. Denman argues that Sinea's claims are preempted by federal law, which generally requires the employee to exhaust all grievance and arbitration provisions set forth in the applicable collective bargaining agreement prior to filing suit in either federal or state court.[6] Because it was uncontroverted that Sinea did not institute grievance proceedings following the May 1995 injury, Denman argues that it was entitled to judgment in its favor.

Section 301 of the Labor Management Relations Act ("LMRA") provides:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without regard to the citizenship of the parties." Section 185(a), Title 29, U.S.Code.

 Section 301 expresses a federal policy that federal laws should apply to disputes arising out of labor contracts. *Street v. Gerstenslager Co.* (1995), 103 Ohio App.3d 156, 160, 658 N.E.2d 1105, 1107–1108; *Textile Workers v. Lincoln Mills* (1957), 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972. In this regard, the United States Supreme Court has held:

"If the policies that animate [Section] 301 are to be given their proper range * * * the pre-emptive effect of [Section] 301 must extend beyond suits alleging contract violations. * * * [Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. [A contrary result would] allow parties to evade the requirements of [Section] 301 by relabeling their contract claims as claims for

---

6. State and federal courts have concurrent jurisdiction over claims involving a breach of a collective bargaining agreement. Nevertheless, where the federal law preempts state law, the state court must apply federal law to the claim before it.

tortious breach of contract." *Allis–Chalmers Corp. v. Lueck* (1985), 471 U.S. 202, 210–211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206, 215.

Accordingly, Section 301 preempts state claims in two situations: if the state claim is founded on rights created by collective bargaining agreements, or if the rights are created by state law but the application of the law is dependent on an analysis or interpretation of a collective bargaining agreement. *Street,* 103 Ohio App.3d at 160, 658 N.E.2d at 1107–1108; *Lopez v. Continental Can Co., Inc.* (C.A.9, 1992), 961 F.2d 147, 148–149.

In the case at bar, Denman failed to address either at trial or on appeal whether Sinea's claim was founded on rights created by the collective bargaining agreement or whether it was independent of the collective bargaining agreement, but was still dependent on an analysis of the collective bargaining agreement for resolution.

Nevertheless, we do not believe that Sinea's intentional tort claim is founded exclusively on rights created by the collective bargaining agreement. His primary contention is that Denman failed to honor valid medical restrictions imposed by his own physician and the corporate physician, especially when it could have reasonably done so by placing him in the laboratory position or other suitable position. Denman's general obligation to honor an employee's valid medical restrictions when it can reasonably do so would arise first and foremost under its statutory duty to protect "the life, health, safety, and welfare" of its employees pursuant to R.C. 4101.11. See, also, R.C. 4101.12 (duty of employer to provide a safe place of employment). While the collective bargaining agreement in the case at bar does contain similar references to Denman's duty to protect the safety and health of its workers, the contract simply incorporates applicable state law expressly into its terms.

Regarding the second instance in which an independent state claim may, nevertheless, be dependent on an analysis of the collective bargaining agreement for its resolution, we do not see any need to rely on the contract at issue in order to resolve the claim. The underlying factual basis of his claim turned on whether Denman's representatives, in particular Durkin, intentionally ignored valid work restrictions so that the resulting aggravation of Sinea's back condition became a substantial certainty. The question was not whether Denman's management *could* engage in such actions, rather it was, *did they*?

In light of the above, we do not believe that federal law preempted Sinea's state intentional tort claim in the case at bar. Therefore, federal law going to the need to exhaust grievance and arbitration provisions has no application in the case at bar. Denman's first and second assignments of error are without merit.

In the third and final assignment of error, Denman contends that the trial court erred when it failed to grant it a new trial. According to Denman, a new trial was warranted because of misconduct of the Sineas' counsel during closing arguments and because the trial court improperly allowed the Sineas to give expert testimony as to Sinea's future wage loss. We disagree.

"Great latitude is afforded counsel in the presentation of closing arguments to the jury." *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph two of the syllabus. "The assessment of whether the permissible bounds of closing argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court." *Id.* at paragraph three of the syllabus. An appellate court will not reverse the trial court's decision in this regard absent an abuse of discretion. *Id.* An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482–483, 450 N.E.2d 1140, 1141–1142.

Nevertheless, prejudicial error can occur when counsel makes remarks that are not supported or warranted by the evidence and which are calculated to arouse passion or prejudice or are designed to misrepresent the evidence to the extent that there is a substantial likelihood that the jury may be misled. *Jones v. Macedonia–Northfield Banking Co.* (1937), 132 Ohio St. 341, 8 O.O. 108, 7 N.E.2d 544. Only if circumstances are of such reprehensible and heinous nature as to constitute prejudice will an appellate court reverse the judgment of the trial court. *Kubiszak v. Rini's Supermarket* (1991), 77 Ohio App.3d 679, 688, 603 N.E.2d 308, 314.

Denman raises several items in support of its claim that opposing counsel committed prejudicial error in closing arguments. First, the Sineas' counsel made a "Golden Rule" argument during closing arguments in which he asked the jury to consider how much they would want to be paid if the jury members were in Sinea's shoes. Denman's counsel rightly objected and moved the court for a mistrial. The court found the comment improper, but instructed the jury to disregard the statement.

A "Golden Rule" argument exists when counsel appeals to the members of the jury to abandon their position of impartiality by placing themselves in the place of one of the parties. *Cooley v. Leaseway Transp. Co. U.S.A.* (May 20, 1993), Cuyahoga App. Nos. 62198, 62732, unreported, at 16, 1993 WL 172988. Recently, it has been held that this type of argument is no longer *per se* prejudicial. *Id.; Dillon v. Bundy* (1991), 72 Ohio App.3d 767, 775, 596 N.E.2d 500, 505–506; *Kubiszak.*

64

In the case at bar, the trial court immediately acted upon the error and gave the jury a curative instruction to disregard the statement. Since a jury is presumed to follow the instructions of the trial court, Denman has failed to demonstrate that it was prejudiced by the comment. Thus, we cannot say that the trial court abused its discretion by denying Denman's motion for a new trial on this ground. *Pang*, 53 Ohio St.3d at 195, 559 N.E.2d at 1321–1322.

Second, Denman contends that opposing counsel improperly asked the jury to speculate on what Durkin's salary was. During the course of the trial, the Sineas' counsel asked Durkin what her salary was and the trial court sustained Denman's objection to the question on the grounds of relevancy. During closing arguments, the Sineas' counsel stated:

"The only person who continues to work there [at Denman] uninterruptedly, and it is no coincidence, is Pat Durkin. Pat Durkin is still there today. I asked Pat Durkin—David knew his salary of $25,000, hard working guy. I asked Mrs. Durkin how much she made. We never got to know. We'll never know how much she makes for the responsibility of going through David's file. How many other files that she goes through? You know what the bottom line is. You know what the purpose is. To save all the money she can for the company."

Interestingly, Denman's counsel did not object to this passage but instead raised the issue himself in Denman's closing arguments. Counsel asserted that the Sineas' case was so weak that they had to ask Durkin what her salary was, "when the judge himself tells you, that is not to be answered."

There is no question in the case at bar that the Sineas' counsel improperly commented on the fact that the trial court sustained the objection to the question about Durkin's salary. On appeal, the Sineas attempt to argue that they had a right to question Durkin about her large salary to demonstrate that she was in a superior position and, thus, responsible for Sinea's job assignments. Even if we assume that were true, it is not acceptable for counsel to comment on a trial court's ruling in the manner that was done here.

Nevertheless, we do not believe, after reviewing the Sineas' closing arguments in their entirety, that the trial court abused its discretion in overruling the motion for a new trial. The special interrogatories in the case at bar established that the jury was on the correct path as to the pertinent factual questions before it. There is no reason to believe that an isolated comment on Durkin's salary would alter this path. Nor is the amount of the verdict unduly high or indicative of improper passions or influence given the allegations against Denman.

The third and final alleged incident of misconduct in closing arguments was a statement by the Sineas' counsel that Sinea's doctor refused to talk to Durkin about Sinea's condition because Sinea had not signed a medical release form authorizing his doctor to do so. Denman's counsel objected on the grounds

that the evidence did not establish that the doctor refused to talk to Durkin because of the absence of a medical release form. The trial court indicated that it could not remember if that was the state of the evidence. However, it still permitted the Sineas' counsel to suggest that Sinea's doctor refused to talk to Durkin because he was without authorization to do so in general.

The record actually indicated that Sinea's doctor indicated that he declined to talk to Durkin when she telephoned him because Sinea's attorney in the workers' compensation claim asked him not to do so until he received authorization from the attorney. On appeal, Denman argues that this was an attempt to argue falsely matters not in evidence.

On this point, we fail to see what, if any, prejudice arose as a result of the comment that Sinea's doctor did not agree to talk to Durkin because Sinea had not signed a medical release form. The jury could just as easily have been offended by Sinea's conduct. In either case, the jury was well aware of the fact that Sinea's doctor refused to cooperate with Durkin. Again, we have no reason to believe that this isolated comment unduly influenced the jury against Denman.

Finally, Denman argues that its motion for a new trial should have been granted on the grounds that the Sineas were permitted to offer expert testimony as to the value of Sinea's lost wages when neither of them was an expert. Although it did not expressly so indicate, the motion was presumably brought pursuant to Civ.R. 59(A)(9), which permits a trial court to grant a new trial when it committed an error of law that was brought to its attention at trial. In applying this rule, this court has held that a new trial should be granted when, as a matter of law, the trial court has committed an error of law that was prejudicial to the moving party. *Willoughby v. On–the–Greens Condominium Co.* (Sept. 6, 1996), Lake App. No. 95–L–170, unreported, 1996 WL 535159.

According to Denman, the Sineas made several assumptions that had no basis in evidence when they testified that Sinea suffered $695,000 in lost wages. These assumptions included Susan Sinea's claim that her husband's pay would increase over the years and that the increases would be similar to those contained within the collective bargaining agreement, that he would work until age fifty-five or sixty-five, and that a job would be available for Sinea at Denman until he retired. She was also permitted to testify over Denman's objection that her husband lost his pension. Denman contends that because this was the only evidence of the Sineas' future wage loss claim, Denman was highly prejudiced by the $695,000 figure.

In response, the Sineas appear to concede on appeal that expert testimony was needed to support the $695,000 figure.[7] Nevertheless, they argue that there is no

---

7. Of course, Mrs. Sinea would be entitled to testify to those matters within her own personal knowledge had she laid out a proper foundation. For example, she likely would have

reason to believe that the $125,000 verdict contained any award for future lost wages. In this respect, they essentially contend that Denman cannot demonstrate prejudice when it failed to test the jury's verdict through more extensive interrogatories.

We agree. It is impossible to determine if the $125,000 reward represented some amount for Sinea's pain and suffering, given the extensive testimony on the subject. Further, the amount is not unduly high and is nowhere near the proposed figure of $695,000. As a result, we cannot say that the trial court erred when it overruled Denman's motion for a new trial.

In light of the foregoing analysis, none of Denman's three assignments of error are well taken. The judgment of the trial court is affirmed accordingly.

 Turning to the assignments of error in the cross-appeal, the Sineas argue in the first cross-assignment of error that the trial court erred when it denied their request for prejudgment interest from the date of the injury. They also claim that the trial court erred when it denied them their right to present evidence at a hearing on the matter. See R.C. 1343.03(C).

 Regarding the issue of the Sineas' right to an evidential hearing on their motion for prejudgment interest, this court has concluded previously that the statute envisions the provision of a forum for evidential input. *Wallace v. Warren Bd. of Edn.* (Dec. 7, 1990), Trumbull App. No. 89–T–4297, unreported, 1990 WL 199109. Nevertheless, we also determined in *Wallace* that a moving party can effectively waive the right to an oral evidential hearing.

Nevertheless, we believe that the holding in *Wallace* is not dispositive because in *Wallace* the party opposing prejudgment interest submitted evidentiary materials in support of its position. Thus, in *Wallace,* there was some evidentiary basis supporting the trial court's decision to deny prejudgment interest.

In the case at bar, neither party submitted or attempted to submit any evidential materials in support of their positions. This was true both of the motion and the subsequent hearing that was granted. Instead, counsel for both parties gave unsworn statements at this oral, nonevidentiary hearing as to their respective pretrial settlement efforts. Thus, the trial court's decision to deny prejudgment interest was not supported by any evidence.[8] See *Flynn v. Nutt*

---

personal knowledge of the fact that her husband lost his pension. However, she would not be permitted to testify as a lay person to speculative statements about future earnings if such statements were beyond her own knowledge. That would not, however, prevent her from testifying to the underlying facts that were within her knowledge.

8. In the trial court's defense, we note that we are tempted to apply the invited error doctrine in the case at bar. The trial court asked the Sineas' counsel for case law indicating whether

(Oct. 25, 1996), Trumbull App. No. 96–T–5466, unreported, 1996 WL 648938. As a result, we must reverse the trial court's decision denying prejudgment interest and remand the matter for further proceedings consistent with the opinion of this court.

Given our disposition of the hearing issue, we decline to address the merits of the trial court's ruling on the Sineas' motion for prejudgment interest. The Sineas' first assignment of error under the cross-appeal is well taken to the extent indicated.

In their second assignment of error under the cross-appeal, the Sineas contend that the trial court erred by failing to instruct the jury on the issues of punitive damages. By the same token, they allege that this decision improperly denied them the right to attorney fees on the assumption that an aggrieved party may recover attorney fees where the award of punitive damages is proper. See *Hutchinson v. J.C. Penney Cas. Ins. Co.* (1985), 17 Ohio St.3d 195, 17 OBR 432, 478 N.E.2d 1000. According to the Sineas, they objected to the trial court's decision to remove the issues from the jury and thereafter filed a motion for a new trial on the matter pursuant to Civ.R. 59(A)(9).

Initially, we note that Denman contends that the trial court granted its motion for directed verdict on the issue of punitive damages and attorney fees and the Sineas subsequently failed to object to the verdict forms or otherwise object to the lack of a jury instruction on the same. Thus, Denman contends that the Sineas failed to bring the matter to the attention of the trial court and failed to prove they were entitled to a new trial on the issue pursuant to Civ.R. 59(A)(9).

The record before this court, however, does not indicate that Denman moved for a directed verdict on the issue or that the trial court granted one. Instead, it appears that the trial court simply failed to give the Sineas' proposed instruction on the issue of punitive damages and thus removed the issue from the jury's consideration in this manner. While the effect may be the same, we nevertheless confirm that the Sineas did object to the court's refusal to give the punitive damage instruction at trial. Thus, the matter was brought to the attention of the trial court so that waiver does not apply in this case.

We also believe that the Sineas sufficiently preserved the issue of attorney fees despite their failure to present the court with a specific instruction on liability for attorney fees. First, Denman was put on notice that the Sineas were requesting attorney fees as part of their punitive damages because the Sineas expressly sought both punitive damages and attorney fees in their complaint.

---

an evidentiary hearing was required as a matter of law. Counsel failed to provide any, simply arguing that it would be helpful to hold an evidentiary hearing on the matter.

Second, the jury would be instructed on the issue of attorney fees only if the jury were also being instructed on an award of punitive damages. The Sineas asked for an instruction on punitive damages, but the trial court denied their request. The Sineas objected to the trial court's failure to give the instruction. However, since the Sineas were aware that the trial court refused to give the instruction on punitive damages, it would serve no purpose to require them to put the court on notice that the jury should also be instructed on attorney fees.

That being said, we turn to the case law governing when an instruction on punitive damages is warranted. Before submitting the issue of punitive damages to the jury, the trial court must review the evidence to determine if reasonable minds can differ as to whether "actual malice" existed. *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. Actual malice is established when a party exhibits (1) that state of mind under which a person's conduct is characterized by hatred, ill will, or a spirit of revenge, or (2) a conscious disregard for the rights and safety of others that has a great probability of causing substantial harm. *Id.* at syllabus.

At trial, the Sineas argued that they presented sufficient evidence to create a jury question on both prongs of the actual malice test. However, we agree with the trial court that an instruction on punitive damages is not automatically warranted in every claim of an intentional workplace tort. Nevertheless, we believe that the Sineas presented sufficient evidence to raise a jury question as to whether Denman's representatives acted with actual malice.

If believed, the evidence showed that Durkin, on behalf of the company, authorized a document as late as May 10, 1995, which indicated that Denman was appealing a workers' compensation claim by Sinea on the grounds that "Employer does not have medical stating current conditions." That would indicate that the company deliberately refused to recognize Sinea's work restrictions. There was also evidence, which if believed, raised the reasonable inference that Durkin was either eager to fire him or was trying to get him to quit. Similarly, if believed, there was testimony that Durkin actually threatened to fire him if he continued to insist that Denman recognize his medical restrictions.

Moreover, the failure of the trial court to give the instruction was prejudicial, given the jury's answers to the special interrogatories in the case at bar. (See answers set forth in footnote 4.) As a result, the trial court erred by not granting the Sineas' motion for a new trial on the issue of punitive damages and attorney fees. The second assignment of error under the cross-appeal is well taken and the matter is remanded on the issue of punitive damages and attorney fees.

In the third and final assignment of error under the cross-appeal, the Sineas contend that the trial court abused its discretion when it denied their motion for attorney fees pursuant to Civ.R. 37(C). We disagree.

Civ.R. 37(C) reads:

"If a party, after being served with a request for admission under Rule 36, fails to admit the genuineness of any documents or the truth of any matter as requested, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, he may apply to the court for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorney's fees. Unless the request has been held objectionable under Rule 36(A) or the court finds that there was a good reason for the failure to admit or that the admission sought was of no substantial importance, the order shall be made."

The decision whether to grant sanctions pursuant to Civ.R. 37(C) rests within the sound discretion of the trial court. *Itskin v. Restaurant Food Supply* (1982), 7 Ohio App.3d 127, 129, 7 OBR 161, 162–163, 454 N.E.2d 583, 586–587. An appellate court will not reverse the decision of the trial court in this regard absent an abuse of discretion. *Id.*

In the case at bar, the Sineas had two claims that they alleged in their motion for attorney fees. First, they contend that Denman improperly failed to explain why it was denying sixteen of their requests for admissions. Each of the contested requests followed a specific request for an admission and read, "If you deny this request to admit, set forth each and every fact upon which you base your denial." Denman responded to each: "Objection. This is not a proper request for Admissions in accordance with the Rules of Civil Procedure. Otherwise, it is denied." [9]

We find no abuse of discretion in the trial court's decision to deny appellant's request for Civ.R. 37(C) sanctions. We agree with Denman that the Sineas' request was not a proper request for admissions since it demanded that Denman "set forth each and every fact" relevant to the denial. In general, a request for an admission should be phrased simply and directly so that it can be admitted or denied without explanation. See 8A Wright, Miller & Marcus, Federal Practice and Procedure (2 Ed.1994) 546–547, Section 2258. Thus, the

---

9. We note that the Sineas failed to move the court pursuant to Civ.R. 36(A) to address whether Denman's objections to the requests were justified. Nevertheless, the Supreme Court of Ohio has held that no motion to compel more complete answers to a request for admissions need be filed as a prerequisite to moving for sanctions pursuant to Civ.R. 37(C). *Salem Med. Arts & Dev. Corp. v. Columbiana Cty. Bd. of Revision* (1998), 82 Ohio St.3d 193, 196, 694 N.E.2d 1324, 1327–1328.

trial court did not abuse its discretion in denying the motion for sanctions on this ground.

The Sineas' second contention is that Denman denied five requests for admissions which they later proved as true at trial, as evidenced by the jury's verdict and the special interrogatories. In the answers, Denman was asked to admit the following: that Tackett required Sinea to continue to do tasks in violation of his medical restrictions, that Sinea was required to perform tasks that exceeded his restrictions, that Denman had the opportunity to make adjustments that would provide a safe working environment for Sinea, and that Sinea was injured as a direct and proximate result of Denman's actions.

A review of the above items reveals that each of the factual issues was hotly debated and contested at trial. In particular, witness credibility was a critical and highly debated topic. As a result, Denman had good reason within the meaning of Civ.R. 37(C) to deny the request for admissions on the above subjects. Consequently, the trial court did not abuse its discretion in denying the Sineas' motion. The Sineas' third assignment of error of the cross-appeal is not well taken.

In summary, none of Denman's three assignments of error are well taken. The Sineas' first and second assignments of error under the cross-appeal are well taken to the extent indicated. The third assignment set forth in the cross-appeal is without merit.

In light of the foregoing, the judgment of the trial court is affirmed in part and reversed in part, and the matter is remanded for further proceedings consistent with this opinion.

*Judgment accordingly.*

FORD, P.J., and NADER, J., concur.