OPINION
{¶ 1} Appellant, Mildred Frost, appeals from the final judgment of the Trumbull County Court of Common Pleas following a jury trial resulting in a jury verdict in appellees', Michael Snitzer, M.D., et al., favor. We affirm.
 {¶ 2} From March 4, 2000 through March 11, 2000, Dr. Neal Frost, an obstetrician-gynecologist, was hospitalized after experiencing difficulty breathing and shortness of breath. An ultrasound revealed Dr. Frost possessed a massive pulmonary embolus, a blood clot in his lung. The embolus had caused significant stress and swelling on the right side of Dr. Frost's heart resulting in right ventricular hypertrophy, an enlargement of the heart muscle. Blood tests, referred to as INR tests, were taken to determine the risk of clotting.[1] The test results showed Dr. Frost had an INR reading of 1.2. A safe, therapeutic INR is in between 2.0 and 3.0.
 {¶ 3} Dr. Michael Snitzer, Dr. Frost's attending physician, testified he discussed the various ways of managing Dr. Frost's condition with him, including thrombolitics, the insertion of an IVC filter, and the use of anti-coagulating drugs. During his stay, Dr. Frost was prescribed Heparin and Coumadin, blood thinners used to reduce the likelihood of clotting. Dr. Frost was responding well to the medication and, at the time of his release from the hospital, his INR measured 2.1.
 {¶ 4} After being discharged, Dr. Frost had his blood tested on March 17, 2000. The results showed his INR had again dropped to a dangerous, subtherapeutic 1.3. Dr. Snitzer had Dr. Frost come into his office on March 18, 2000 concerning the low INR count. Testimony indicated Dr. Frost's low INR was life threatening such that he could "drop dead" from a reoccurring embolism.
 {¶ 5} During his March 18, 2000 visit, Dr. Snitzer testified he provided Dr. Frost with several options regarding his care. First, Dr. Snitzer testified he recommended Dr. Frost be immediately removed to the hospital and placed on a Heparin drip until his INR stabilized between 2.0 and 3.0. According to Dr. Snitzer, Dr. Frost declined this option because he had recently spent a week in the hospital and wanted to return to his busy obstetric practice. Next, Dr. Snitzer stated he discussed the use of the anti-coagulant drug Lovenox with Dr. Frost. According to Dr. Snitzer, Lovenox is similar to Heparin but may not absorb as well as Heparin in larger, obese individuals. Testimony indicated Dr. Frost was morbidly obese, weighing approximately 360 lbs. Under the circumstances, Dr. Snitzer did not highly recommend Lovenox; however, he believed it would be better than no treatment. Again, Dr. Frost refused Lovenox therapy.
 {¶ 6} Next, Dr. Snitzer testified he recommended Dr. Frost be transferred to the Cleveland Clinic to obtain subcutaneous Heparin as well as a second opinion. In fact, at Dr. Snitzer's behest, his office manager, Pam Storey, attempted to make Dr. Frost an appointment with the Cleveland Clinic. However, before Ms. Storey could make the call, Dr. Frost instructed her that he was a physician and could make the appointment "in a heartbeat." Storey's testimony corroborated this exchange.
 {¶ 7} Dr. Snitzer testified his final recommendation involved increasing Dr. Frost's Coumadin dosage until he was within a therapeutic range. Dr. Frost assented to continuing the Coumadin therapy. However, Dr. Snitzer testified he instructed Dr. Frost to have his INR checked again within three to four days to be certain the Coumadin was working effectively. With the exception of the Coumadin recommendation, none of the other recommended options were noted in Dr. Frost's chart. Dr. Snitzer testified he did not chart the recommendations that Dr. Frost refused because Dr. Frost was a friend and he did not want to embarrass him. Dr. Snitzer also testified he did not believe Dr. Frost's refusals would assist a future treating physician and, in any event, he was not thinking of litigation at the time of the appointment.
 {¶ 8} Dr. Snitzer was on vacation the following week (March 20 through March 24). He testified two other physicians, Drs. Vance and James, covered his patients during that week. Dr. Snitzer testified he alerted Drs. Vance and James of Dr. Frost's condition and notified them that Dr. Frost's INR results would most likely be coming in that week. Dr. Frost did not have his INR tested until the afternoon of Friday, March 24, 2000, six days after his appointment. He died two days later of a pulmonary embolism.
 {¶ 9} On December 28, 2001, appellant filed a claim sounding in negligence against appellees. The dispute proceeded to a jury trial which commenced on October 19, 2004. After several days of testimony, the jury rendered a verdict in appellees' favor. Appellant subsequently filed a motion for a new trial pursuant to Civ.R. 59(A). The motion was denied on June 29, 2005. Appellant now appeals and raises the following assignments of error:
 {¶ 10} "[1.] The trial judge abused his discretion by permitting witnesses to bolster the defense[`s] case with testimony of out-of-court statements.
 {¶ 11} "[2.] The trial judge abused his discretion by prohibiting plaintiff from using the deposition testimony of Dr. Skirball in rebuttal.
 {¶ 12} "[3.] The trial judge skewed the proceedings and irreparably prejudiced plaintiff's case by commenting upon the veracity of a defense witness.
 {¶ 13} "[4.] The trial judge erred, as a matter of law, by refusing to instruct the jurors upon the standard of care increasing in proportion to the danger that should reasonably be foreseen.
 {¶ 14} "[5.] The trial judge abused his discretion in declining to grant the motion for new trial."
 {¶ 15} Under her first assignment of error, appellant argues the trial court erred in admitting hearsay evidence which improperly bolstered the credibility of appellee's testimony.
 {¶ 16} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."
 {¶ 17} The foregoing rule governs the admissibility of "out-of-court statements." The basic rationale for excluding hearsay testimony is its potential for inaccuracy, i.e., information obtained from a person directly is likely to be more accurate than information you obtained from that person through an intermediary. See, e.g., Weissenberger's Ohio Evidence, 2003, Section 801.1.
 {¶ 18} To constitute hearsay, two elements are required: First, there must be an out-of-court statement and second, the statement must be offered to prove the truth of the statement asserted. Evid. R. 801(C). If either element is missing, the statement is not hearsay and is therefore admissible. An out-of-court statement is not hearsay if it is offered to prove the statement was made rather than offered for its truth. Statev. Maurer (1984), 15 Ohio St.3d 239, 262.
 {¶ 19} The trial court has broad discretion regarding the admissibility of evidence and its determinations will not be overturned absent an abuse of its discretion. Shull v. Itani,
11th Dist. No. 2002-L-163, 2004-Ohio-1155, at ¶ 39. An abuse of discretion involves more than an error of law or judgment. It suggests the court's determination was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 20} As indicated in the factual recitation, Dr. Snitzer testified that on March 18, 2000, he discussed various options for treating Dr. Frost in light of his subtherapeutic INR readings: (1) hospitalization with a Heparain IV; (2) scheduling an appointment with the Cleveland Clinic for a second opinion and/or subcutaneous Heparin injections; (3) Lovenox therapy; and (4) bumping up Coumadin dosage. However, Dr. Frost's medical charts did not reflect his refusals of hospitalization with a Heparin IV, Lovenox therapy, or a transfer to the Cleveland Clinic. The chart disclosed only the increase in Coumadin and another INR test within "one week."
 {¶ 21} Dr. Snitzer testified that one should "generally" chart all standard of care advice and patient refusals. However, he testified he did not document the refusals because Dr. Frost was a friend and fellow physician who understood the implications of refusing the advice/recommendations. Moreover, Dr. Snitzer noted he was not "thinking of litigation" at the time of he documented Dr. Frost's exam.
 {¶ 22} At trial, both Mary Storey and Pam Rappach testified to statements made by Dr. Snitzer regarding the advice and recommendations made to Dr. Frost. Appellant maintains Storey's and Rappach's testimony involved out-of-court statements made by Dr. Snitzer offered for the exclusive purpose of proving truth of the matters asserted. We shall address each witness' testimony in turn.
 {¶ 23} Mary Storey, Dr. Snitzer's Office Manager, testified to a conversation she overheard between Drs. Snitzer and Frost during the March 18, 2000 appointment. Storey testified Dr. Frost arrived for his appointment before Dr. Snitzer on the morning of March 18, 2000 and she escorted him to an examination room. After Ms. Storey took Dr. Frost's blood pressure, Dr. Snitzer entered the room and she left. She continued:
 {¶ 24} "Later, Dr. Frost and Dr. Snitzer came out of the room. By this time I moved to the front office where I check people out. I heard him say, let's get this taken care of. Come on, we'll get you back in the hospital. We can do this. We can get this taken care of. He said, I want you to go up to the Cleveland Clinic.
 {¶ 25} "He walked over to the counter, he handed me the routing slip, and he said, Mary, call the Cleveland Clinic. And I turned to call, I had my hand on the phone. Dr. Frost laughed and said, Mary, put the phone down. I'm a physician. I can get in there in a heartbeat. I can get myself in there anytime I want. I've got to get a grip on my schedule. I've got to get back to work, I've got babies to deliver."
 {¶ 26} "* * *
 {¶ 27} "Then Dr. Snitzer came and said to Neil [sic], don't forget to get that Protime next week. I'll be gone. The guys will be here. Don't wait for the weekend, it will be a mess on the weekend."
 {¶ 28} After careful review of the foregoing testimony, it is clear Ms. Storey testified to out-of-court statements made by two declarants, Dr. Snitzer and Dr. Frost. However, we do not believe the statements were offered to prove the truth of the content of Dr. Snitzer's or Dr. Frost's various statements. Storey's testimony demonstrates she was present on March 18, 2000, the day of Dr. Frost's last appointment with Dr. Snitzer. Her testimony relates statements she heard and/or observed during the course of her interaction with Dr. Snitzer and Dr. Frost. Her presence in the office on that date and her testimony is relevant without regard to whether the statements made conveyed accurate information.
 {¶ 29} An important aspect of appellant's case was demonstrating that Dr. Snitzer failed to advise Dr. Frost pursuant to the standard of care. Although Dr. Snitzer testified to making various recommendations, including a transfer to the Cleveland Clinic, none of his recommendations were documented in Dr. Frost's chart. Both appellant's and appellees' experts testified that the standard of care for someone in Dr. Frost's position on March 18, 2000 was to re-admit him to the hospital for Heparin therapy. Mary Storey's testimony was not elicited to prove the veracity of the need or urgency of placing Dr. Frost in the care of the Cleveland Clinic to pursue such treatment. Nor was it offered to prove that Dr. Frost was, by virtue of his status as a physician, able to obtain an appointment whenever he chose. Rather, Storey's testimony was offered merely to relate what she saw or heard while she was at work on March 18, 2000.
 {¶ 30} Further, assuming Ms. Storey's testimony were hearsay, it would be admissible pursuant to Evid.R. 803(1). Evid.R. 803(1), the hearsay exception which governs "present sense impressions," provides:
 {¶ 31} "[a present sense impression is a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate a lack of trustworthiness."
 {¶ 32} Storey testified the declarant, Dr. Snitzer, exited the examination room with Dr. Frost and indicated Dr. Frost needed to be back in the hospital and that he should make an appointment with the Cleveland Clinic. The language of Evid.R. 803(1) requires the hearsay statement be one "describing or explaining" the condition or event perceived. "If the statement tends to interpret, assess or evaluate the condition perceived, it is `explanatory' within [Rule 803(1)]." Weissenberger's Ohio Evidence, 2003, Section 803.5. Storey's testimony reflects an "explanatory" statement uttered by Dr. Snitzer in the course of an appointment in which he perceived, assessed, and evaluated Dr. Frost's medical condition. The trial court did not err in admitting Storey's testimony.
 {¶ 33} Next, Pam Rappach, Dr. Snitzer's medical assistant, testified she learned of Dr. Frost's death on Monday, the day after he passed. With respect to her recollection of that day, the following exchange took place on direct examination:
 {¶ 34} "Q. Do you remember how you learned [of Dr. Frost's death]?
 {¶ 35} "A. I'm not sure whether a group of people were talking about it or whether Dr. Snitzer told me directly. I can't remember that long ago.
 {¶ 36} "* * *
 {¶ 37} "Q. Did you have any conversations with Dr. Snitzer?
 {¶ 38} "A. We discussed it throughout the whole day. He was just devastated.
 {¶ 39} "Q. When you say, we discussed it, who is the we?
 {¶ 40} "A. Our office staff.
 {¶ 41} "Q. Did Dr. Snitzer discuss it?
 {¶ 42} "* * *
 {¶ 43} "A. He was saying he wished Dr. Frost would have listened and went to Cleveland." Rappach further testified that Dr. Snitzer discussed the March 18, 2000 appointment with her. According to Rappach, Dr. Snitzer stated:
 {¶ 44} "He had tried to get him to make an appointment to go to Cleveland, and Mary [Storey] wanted to call. And [Dr. Frost] said he was a physician, if he wanted to go, he could pick up the phone and get an appointment himself."
 {¶ 45} Appellee argues Rappach's testimony reflects his own spontaneous or excited utterance which was a response to Dr. Frost's death. As such, even if it is hearsay, appellee maintains the statement is excepted via Evid.R. 803(2). We disagree with appellee's argument. Evid.R. 803(2) reads:
 {¶ 46} "Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."
 {¶ 47} An excited utterance is admissible because the context of the utterance — a startling event, a statement pertaining to that event, a declarant under the stress of that event — does not permit the declarant a meaningful opportunity to reflect on statements regarding that event. State v. Wallace (1988),37 Ohio St.3d 87, 88; see, also, Potter v. Baker (1955),162 Ohio St. 488, 498 (commenting upon the temporal component of a "spontaneous exclamation," the common law derivative of Evid.R. 803(2)). "This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock." Wallace, supra, quoting 6 Wigmore, Evidence (Chadbourn Rev. 1976), 195, Section 1747.
 {¶ 48} Here, Dr. Snitzer's statements to Ms. Rappach were made the morning after Dr. Frost's death. The record is unclear as to when Dr. Snitzer was notified of Dr. Frost's death. While considerations regarding the declarant's possible "time to devise or contrive" are not conclusive of the Evid.R. 803(2) analysis, they are fundamental and thus highly important. Without such evidence, it is impossible to evaluate whether Dr. Snitzer could reasonably be "under the stress or excitement caused by the event." Without more evidence as to his excited state, we decline to hold that Dr. Snitzer's statement falls within the gamut of Evid.R. 803(2).
 {¶ 49} That said, the preceding discussion presumes Rappach was testifying to hearsay statements. We do not believe Rappach's testimony meets the definition of hearsay delimited by Evid.R. 801(C); to wit, we do not believe Rappach's testimony was offered to prove the truth of Dr. Snitzer's assertions. Rappach's testimony demonstrates she was present when Dr. Snitzer made certain statements regarding Dr. Frost and his appointment on March 18, 2000. Rappach did not so testify in order to prove the veracity of Dr. Snitzer's wishes or efforts as they pertained to his care of Dr. Frost. The statements are relevant independent of whether they convey accurate information. Accordingly, the hearsay prohibition is not operative and the testimony about the statement was properly admitted.
 {¶ 50} An additional matter needs attention: At oral argument, counsel cited In re Coy, 67 Ohio St.3d 215,1993-Ohio-202, to support the position that Dr. Snitzer used the testimony of Mary Storey and Pam Rappach to improperly bolster his own testimony. Appellant argues that such a maneuver is invalid and represents "classic hearsay."
 {¶ 51} In Coy, the Supreme Court of Ohio held that a party may not introduce his or her out-of-court statements through other witnesses by recourse to Evid.R. 801(D)(2)(a), the rule controlling out-of-court statements made by a party opponent. Doing so is tantamount to introducing your own hearsay statements and Evid.R. 801(D)(2)(a) explicitly "applies to statements offered against a party where the statements are the party'sown." Coy, supra, at 218. (Emphasis sic).
 {¶ 52} In the instant matter, we do not hold the statements of Storey and Rappach were admissible through Evid.R. 801(D)(2); rather, the statements were admissible because they were not offered to prove the truth of Dr. Snitzer's out-of-court statements. In short, Coy is inapplicable to the instant matter. Accordingly, appellant's "bolstering" argument has no merit: The fact that the non-hearsay testimony in question may have had a positive impact upon the credibility of the declarant-witness does not bear upon its admissibility.
 {¶ 53} One final word on the instant issue is appropriate: All hearsay problems impute concerns with accuracy and reliability. Here, coincidentally, the declarant was available to testify as to the out-of-court statements in question. As Weissenberger astutely observes:
 {¶ 54} "In understanding the structure of the hearsay system, it is important to appreciate that the trial of a lawsuit customarily relies on three fundamental devices to maximize the accuracy of testimony submitted to the trier of fact:
 {¶ 55} "1. The first safeguard, and the most important, is the device of prompt (i.e. `fresh') cross-examination of a witness who testifies at trial.
 {¶ 56} "2. The second device is the oath administered to a witness before he takes the stand to testify at trial.
 {¶ 57} "3. The third safeguard is the opportunity of the trier of fact to observe the demeanor of the witness while he is testifying.
 {¶ 58} "The law of evidence surrounding hearsay has developed a system of exclusion which rejects the admission of much evidence that fails to satisfy these three safeguards. Accordingly, many out-of-court statements are rendered inadmissible by the hearsay system because of their inherent unreliability." Weissenberger's Ohio Evidence, (2003), section 801.1.
 {¶ 59} Under the circumstances of the instant trial, the declarant and the witnesses were subjected to cross-examination under oath in front of the trier of fact. The law acknowledges such testimony possesses a greater indicia of reliability than that dispossessed of such features. In effect, the concerns traditionally animating the rules excluding hearsay testimony are not present in the instant matter.
 {¶ 60} For these reasons, the trial court did not abuse its discretion in admitting the challenged testimony of Storey and Rappach. Accordingly, appellant's first assignment of error is without merit.
 {¶ 61} Under her second assignment of error, appellant contends the trial court abused its discretion when it prohibited her from using Dr. Skirball's deposition as rebuttal testimony.
 {¶ 62} Rebuttal evidence is "* * * that which is given to explain, repel, counteract, or disprove facts given in evidence by the adverse party. It is that evidence which has become relevant or important only as an effect of some evidence introduced by the other side." Nickey v. Brown (1982),7 Ohio App.3d 32, 35; see, also, Minnis v. Cornelius (Sept. 22, 2000), 11th Dist. No. 99-L-118, 2000 Ohio App. LEXIS 4358, at 121-3. "A party has an unconditional right to present rebuttal testimony on matters which are first addressed in an opponent's case-in-chief and should not be brought in the rebutting party's case-in-chief." Phung v. Waste Mgmt., Inc. (1994),71 Ohio St.3d 408, 410. The appropriate scope of rebuttal evidence is a matter within the trial court's discretion. Minnis, supra, at 13.
 {¶ 63} Appellant contends the defense raised a new issue in its case-in-chief and therefore she was entitled to respond via rebuttal in the form of deposition testimony. Defense expert, Dr. Raymond Rozman, testified that the decrease in Dr. Frost's INR resulted from his failure to take his anti-coagulant medication. Alternatively, Dr. David Skirball, an additional expert retained by the defense maintained in his deposition that no conclusion could be drawn regarding whether Dr. Frost had taken his medication. Because Dr. Skirball's opinion differed from Dr. Rozman's testimony on an issue first raised by her opponent, appellant contends the trial court abused its discretion when it refused to admit Dr. Skirball's deposition testimony for purposes of rebuttal.
 {¶ 64} A review of the record indicates that this issue wasnot first raised by appellees in their case-in-chief. Rather, appellant, during cross-examination of Dr. Snitzer, elicited the following testimony:
 {¶ 65} "Q. * * * you couldn't make any conclusions when somebody's INR drops from 2.2 to 2.1 that something bad has happened, right?
 {¶ 66} "A. Absolutely not.
 {¶ 67} "Q. By the same token, you can't make any conclusions when someone's INR drops from 1.3 to 1.2 that they're not taking their medication, can you?
 {¶ 68} "A. That's a differential, sure. But I can't make that conclusion.
 {¶ 69} "Q. There is no way you can tell this jury he wasn't taking his medicine, and I know that because it dropped from 1.3 to 1.2?
 {¶ 70} "A. No.
 {¶ 71} "Q. Okay. If some expert like Dr. Rozman comes in and tells the jury that, that's nonsense, isn't it?
 {¶ 72} "A. No, I couldn't say that.
 {¶ 73} "Q. But you for sure don't make that conclusion, right, because it's just a fluctuation; true?
 {¶ 74} "A. From 1.3 to 1.2, it could be a fluctuation. But it also could have shown noncompliance.
 {¶ 75} "Q. And it can also, sir show underdosage, right?
 {¶ 76} "A. Yes, it could."
 {¶ 77} The foregoing examination occurred well before Dr. Rozman testified at trial. Appellant anticipated Dr. Rozman's challenged testimony and responded to it during her cross-examination of Dr. Snitzer. The jury was aware that one possible cause of Dr. Frost's INR drop was failure to medicate; however, the jury was also aware that such a determination could not be conclusively established under the circumstances. Because appellee, through Dr. Rozman, did not introduce a "new matter," we believe the trial court did not act unreasonably in prohibiting appellant from reading Dr. Skiball's deposition testimony into the record for purposes of rebuttal. Appellant's second assignment of error lacks merit.
 {¶ 78} Appellant's third assignment of error argues the trial judge skewed the proceedings and prejudiced her case by commenting upon the veracity of Mary Storey's testimony. Thus, appellant concludes she is entitled to a new trial.
 {¶ 79} During her testimony, Ms. Storey was asked whether there was a way for Dr. Snitzer's office to track the progress of test results, particularly INR result. She testified a system was in place for tracking results, but could not recall when the office began using it. After establishing Ms. Storey could not recall the exact date the system was adopted, the trial court refused to allow any further testimony on the issue. The court then instructed the jury as follows:
 {¶ 80} "Ladies and gentlemen, I have to instruct you at this point, the witness here, Mary is attempting to give her testimony, and there is a question that has arisen about when the system that you have heard testimony on went into effect.
 {¶ 81} "She's being very truthful in that she does not recall specifically when it went into effect, and the Court has ruled that there is a possibility both ways that it was in effect, it was not in effect, I think that it will not be testimony to this jury.
 {¶ 82} "So I would ask you to disregard the testimony you heard from her in regard to the system we've been discussing."
 {¶ 83} Appellant's counsel immediately objected to the court's comment regarding the veracity of the witness. The court informed appellant's counsel that it was not "attempting to approve or disapprove of the veracity of this witness or any other witness; that's not my function." The court then provided the following curative instruction to the jury:
 {¶ 84} "Ladies and gentlemen of the jury, it's been drawn to my attention that I perhaps crossed the line of where I'm supposed to go. I told you to begin with, the Judge is an impartial arbiter in this matter as much as possible.
 {¶ 85} "My comments about the present witness, I used a term that, something to do with she's truthfully trying. That's not my judgment to be given to you. That's a judgment you have to make.
 {¶ 86} "For me to say that a witness is truthful would be just as wrong as for me to tell you they were untruthful.
 {¶ 87} "So, please, disregard that comment that inadvertently I entered into my last rendition. With that, please continue."
 {¶ 88} Generally, an objection is required to preserve an error for appeal. Slaby v. Boyle (June 18, 1999), 11th Dist. No. 97-A-0086, 1999 Ohio App. LEXIS 2807, 11. Appellant's counsel made no objection to the above instruction and did not move for a mistrial. Alleged errors arising in the trial court, but not called to the court's attention at the time when the error could have been corrected, are waived absent plain error. Nozik v.McDonald (June 25, 1999), 11th Dist. Nos. 97-L-235 and 97-L-252, 1999 Ohio App. LEXIS 2957, 12.[2]
 {¶ 89} Here, appellant underscores the considerable influence the trial judge wields over a jury; as such, appellant contends the instruction the trial court issued could not palliate the impact of its initial statement. Appellant concludes the court's alleged endorsement of Ms.Storey's credibility dealt a serious blow to her case sufficient to warrant a new trial. We disagree.
 {¶ 90} First, we believe the initial statement regarding Ms. Storey's truthfulness was inadvertent and, when placed in the full context of the trial, does not indicate an endorsement of her general credibility. Immediately prior to the statement, Ms. Storey had repeatedly testified she could not recall the date of the inception of the tracking program. After sustaining appellant's objection to the testimony, the court made the statement in question while instructing the jury to disregard Storey's testimony on the matter. Although the court's choice of language was suspect and facially inappropriate, we do not think it suggested the court favored Ms. Storey's testimony en masse.
 {¶ 91} Moreover, while the judge could not specifically erase his comment from the memory of the jury, a trial jury is presumed to follow the instructions given to it by the judge. Sinea v.Denman Tire Corp (1999), 135 Ohio App.3d 44, 64. We believe the judge's curative instruction was delivered with alacrity and circumspection: Not only did the judge entreat the jury to ignore his comment, he recapitulated the relative roles of the jury and judge in order to justify his instruction. In our view, the curative instruction was sufficient to curb any potential prejudice flowing from the original comment. Appellant's third assignment of error lacks merit.
 {¶ 92} Appellant's fourth assignment of error contends the trial court erred as a matter of law in omitting her proposed jury instructions regarding the standard of care increasing in proportion to the danger reasonably foreseen.
 {¶ 93} A trial court is required to instruct the jury as to the applicable law on all issues presented in the case that are supported by the evidence. Marshall v. Gibson (1985),19 Ohio St.3d 10, 12. It is well within the discretion of the trial court to determine whether the evidence submitted at trial was sufficient to require a particular instruction. State v. Wolons
(1989), 44 Ohio St.3d 64, paragraph two of the syllabus. Hence, even where a party's requested instruction is proper, a trial court is not constrained to give the instruction as worded.Cleveland Elec. Illuminating Co. v. Astorhurst Land Co. (1985),18 Ohio St.3d 268, 272. So long as the jury is properly instructed on the applicable law for matter at issue, the trial court has fulfilled its duties. Ballard v. Wal-Mart Stores,Inc. (Jan. 11, 1999), 12th Dist. No. CA98-05-014, 1999 Ohio App. LEXIS 40, 4.
 {¶ 94} An appellate court reviews challenged or omitted jury instructions within the context of the entire charge. Nanavativ. Ballentine (Dec. 29, 2000), 11th Dist. No 99-P-0044, 2000 Ohio App. LEXIS 6216, 8. This entails determining whether the trial court's decision to omit the challenged instruction misled the jury in a matter materially affecting the complaining party's substantial rights. Kokitka v. Ford Motor Co. (1995),73 Ohio St.3d 89, 93. However, the mere possibility that the jury may have been misled does not create reversible error where the instructions fairly and correctly state the law applicable to the evidence submitted at trial. Reitz v. Howlett (1995),106 Ohio App.3d 409, 414.
 {¶ 95} An appellate court will reverse a trial court's refusal to give a party's requested jury instructions only if the trial court abused its discretion, and if so, only if that refusal was prejudicial to the complaining party. Ballard,
supra, at 5. "Prejudice" will be found only when the alleged error "cripples the entire jury charge." Jaworowski v. Med.Radiation Consultants (1991), 71 Ohio App.3d 320, 327-328. As a whole, the jury charge must be "so misleading and prejudicial to induce the erroneous verdict." Cleveland Elec. IlluminatingCo., supra, at 274.
 {¶ 96} The omitted jury instruction at issue stated:
 {¶ 97} "* * * The amount of care increases to the amount of danger that reasonably should be foreseen. Ordinary care is a relative term. The test, though, is still ordinary care under the circumstances."
 {¶ 98} In lieu of the foregoing, the jury was accordingly instructed:
 {¶ 99} "* * * negligence is a failure to use ordinary care. Every person is required to use ordinary care to avoid injuring another person. Ordinary care is the care that a reasonably cautious, careful person would use under the same or similar circumstances.
 {¶ 100} "In determining whether ordinary care was used, you will consider whether the defendants * * * ought to have foreseen, under the circumstances, that the natural and probable result of an act or failure to act would cause some injury.
 {¶ 101} "The test of foreseeability is not whether the defendant should have foreseen the injury precisely or exactly as it happened to Neil [sic] Frost. The test is whether under all the circumstances, the defendants * * * should have anticipated that the injury was likely to result to Neil [sic] Frost from their actions or failure to act."
 {¶ 102} Appellant correctly points out that other courts have utilized the very instruction upon which the trial court below passed. However, this does not imply the trial court was required to utilize appellant's requested instruction. To the extent the jury was properly instructed on the requested matter in the course of the general instruction, any omission is, at worst, harmless error.
 {¶ 103} With that in mind, we do not believe the trial court provided the jury with an inaccurate or misleading statement of the law.[3] Thus, under the circumstances, we cannot say that, even had the proposed instruction been warranted, the trial court's refusal materially prejudiced appellant. The trial court's Jury Instruction charged that: "[o]rdinary care is the care that a reasonably cautious, careful person would use under the same or similar circumstances[,]" * * * "proximate cause is an act or a failure to act which in a natural, continuous sequence, directly produces the death, injury or harm and without which it would not have occurred," and "cause occurs when the death, injury or harm is the natural or foreseeable result of the act [or] failure to act" when read in light of the complete instructions were sufficient to inform the jury of the applicable law. See, Nanavati, supra, at 14-15.
 {¶ 104} Appellant's fourth assignment of error is without merit.
 {¶ 105} In her final assignment of error, appellant contends the trial court erred in failing to grant her a new trial.
 {¶ 106} The decision to grant or deny a motion for a new trial under Civ.R. 59(A) is within the sound discretion of the trial court. Retina Associates of Cleveland, Inc. v. Smith,
11th Dist. No. 2002-T-0170, 2003-Ohio-7188, at ¶ 9. When determining whether a trial court abused its discretion, a reviewing court may not substitute its judgment for that of the trial court. Id.
 {¶ 107} Appellant argues the cumulative impact of the alleged procedural errors and/or irregularities detailed above demonstrate she is entitled to a new trial. In Ohio, the cumulative error doctrine is not typically employed in a civil context. Sykes v. General Motors, Corp., 11th Dist. No. 2003-T-0007, 2003-Ohio-7217, at ¶ 39. However, we need not discuss its applicability because we find no error in the errors assigned above.
 {¶ 108} Put differently, because we have overruled each of appellant's assigned errors, we do not believe the cumulative effect of these arguments merit a different result. To summarize, we held the testimony of Ms. Storey and Ms. Rappach was not hearsay because it was not admitted for truth of the matters asserted. We held the trial court did not err in precluding appellant from using Dr. Skirball's deposition testimony to rebut Dr. Rozman's testimony because the issue at hand had been broached by appellant during cross-examination of Dr. Snitzer. We held appellant's case was not prejudiced by the trial judge's statement regarding Ms. Storey's truthfulness. Finally, we held the trial court did not abuse its discretion by not including appellant's requested jury instructions.
 {¶ 109} Without finding an error, there can be no cumulative error. Sykes, supra. Thus, appellant's final assignment of error is without merit.
 {¶ 110} For the foregoing reasons, appellant's five assignments of error lack merit and the jury verdict from which this appeal arises is hereby affirmed.
O'Neill, J., O'Toole, J., concur.
[1] A low INR indicates one is at a higher risk of clotting. Thus, anti-coagulant drugs are prescribed to thin the blood towards the end of increasing one's INR number to a therapeutic range.
[2] While its roots are in criminal law, courts have recognized the application of plain error in civil cases under exceptional and rare circumstances. Goldfuss v. Davidson,79 Ohio St.3d 116, 121, 1997-Ohio-401. Plain error involves any error or defect affecting an individual's substantial rights. In re Knight,
11th Dist. No. 2002-T-0158, 2003-Ohio-7222, at f.n. 3.
[3] Appellant insists that the jury, without the benefit of the proffered instructions, were led to believe "ordinary care" is a static term applying equally to all patients in all situations. We disagree with appellant's characterization. The trial court stated "ordinary care is the care that a reasonably cautious, careful person would use under the same or similarcircumstances." It further stated: "In determining whether ordinary care was used, you will consider whether the defendants * * * ought to have foreseen, under the circumstances, that the natural and probable result of an act or failure to act would cause some injury." (Emphasis added). We believe the foregoing statement stresses the particular context in which Dr. Snitzer treated Dr. Frost. Accordingly, the charge explicitly underscores the relativity and dynamic quality of the medical standard of care under the circumstances.